# HEWITT ET AL. *v.* HELMS

No. 81–638.   Argued November 8, 1982—Decided February 22, 1983

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, POWELL, and O'CONNOR, JJ., joined. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, *post*, p. 478. STEVENS, J., filed a dissenting opinion, in which BRENNAN and MAR-

SHALL, JJ., joined, and in Parts II and III of which BLACKMUN, J., joined, *post*, p. 479.

*LeRoy S. Zimmerman*, Attorney General of Pennsylvania, argued the cause for petitioners. With him on the brief were *Francis R. Filipi* and *Gregory R. Neuhauser*, Deputy Attorneys General.

*Richard G. Fishman* argued the cause and filed a brief for respondent.*

JUSTICE REHNQUIST delivered the opinion of the Court.

Respondent Aaron Helms was serving a term in the State Correctional Institution at Huntingdon, Pa. (SCIH), which was administered by petitioners. He sued in the United States District Court for the Middle District of Pennsylvania, claiming that petitioners' actions confining him to administrative segregation within the prison violated his rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The District Court granted petitioners' motion for summary judgment, but the Court of Appeals for the Third Circuit reversed. 655 F. 2d 487 (1981). We granted certiorari, 455 U. S. 999 (1982), to consider what limits the Due Process Clause of the Fourteenth Amendment places on the authority of prison administrators to remove inmates from the general prison population and confine them to a less desirable regimen for administrative reasons.

In the early evening of December 3, 1978, a prisoner in the state penitentiary at Huntingdon, assaulted two guards. The prisoner was subdued with the assistance of other

---

*Solicitor General Lee, Assistant Attorney General Jensen, Deputy Solicitor General Frey, Barbara E. Etkind,* and *Kathleen A. Felton* filed a brief for the United States as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Leonard Esquina, Jr.,* and *Larry Bennett* for the State Bar of Michigan, Prisons and Corrections Committee; and by *Frederick M. Stanczak* for Susquehanna Legal Services.

guards, but one guard received a broken nose, and another a broken thumb. Later in the evening, the violence erupted into a riot during which a group of prisoners attempted to seize the institution's "control center." One group of inmates attacked a prison guard and a trainee, using table legs, the guard's flashlight, barbells, and whatever else came to hand. On another floor, three inmates were subdued while trying to attack a sergeant of the prison guard with a flashlight, and it was necessary to forcibly subdue them and handcuff them to pipes. Inmates in one of the prison blocks tried to break a grille to enter the prison's control center, but they were held back. One of the assaulted guards suffered cuts and bruises on the face and leg areas, and another reported a possible skull fracture, broken jaw, broken teeth, and an injured collarbone.

This uprising was eventually quelled, but only with the assistance of state police units, local law enforcement officers, and off-duty prison guards whose aid was summoned. Several hours after the riot ended, respondent Helms was removed from his cell and the general prison population for questioning by the state police. Following the interview, he was placed in restrictive confinement,[1] and the state police

---

[1] Pennsylvania has adopted regulations promulgated by the State Bureau of Corrections establishing two basic types of restricted housing in its correctional facilities—disciplinary and administrative segregation. 37 Pa. Code § 95.107 (1978). Other jurisdictions follow a similar pattern. See 28 CFR pt. 541 (1982). Confinement in disciplinary segregation is imposed when an inmate has been found to have committed a misconduct violation. 37 Pa. Code § 95.106(2) (1978). Administrative segregation may be imposed when an inmate poses a threat to security, when disciplinary charges are pending against an inmate, or when an inmate requires protection. § 95.104. According to the state regulations, administrative segregation is somewhat less restrictive than disciplinary segregation, compare § 95.107(a)(2) with § 95.107(b)(2), although, as noted elsewhere, see n. 4, *infra*, we assume for purposes of this case that the conditions in the two types of confinement are substantially identical.

and prison authorities began an investigation into his role in the riot.

On December 4, 1978, Helms was given a "Misconduct Report" charging him with "Assaulting Officers and Conspiracy to Disrupt Normal Institution Routine by Forcefully Taking Over the Control Center." The report briefly described the factual basis for the charge and contained a lengthy recitation of the procedures governing the institution's disciplinary hearing.[2] On December 8, 1978, a "Hearing Committee," consisting of three prison officials charged with adjudicating alleged instances of misconduct by inmates, was convened to dispose of the charges against Helms. Following a review of the misconduct report, the panel summarized its decision as "[n]o finding as to guilt reached at this time, due to insufficient information," and ordered that Helms' confinement in restricted housing be continued.

While as a matter of probabilities it seems likely that Helms appeared personally before the December 8 Hearing Committee, we agree with the Court of Appeals that the record does not allow definitive resolution of the issue on summary judgment. Helms signed a copy of the misconduct report stating that "[t]he circumstance of the charge has been read and fully explained to me," and that "I have had the opportunity to have my version reported as part of the record." App. 41a. Likewise, he admitted in an affidavit filed during this litigation that he was "informed by an institutional hearing committee" of the disposition of the misconduct charge against him. *Id.*, at 33a. The same affidavit, however, asserted that no "hearing" was conducted on December 8, suggesting that respondent did not appear before

---

[2] The misconduct report informed respondent that a hearing would be held as soon as possible, that he could remain silent at the hearing, that he could be represented by an inmate or staff member, and that he could request witnesses who would be permitted to appear if they were found willing, capable of giving relevant testimony, and not a security hazard. App. 38a–39a.

the Committee. The State did not file any affidavit controverting Helms' contention.

On December 11, 1978, the Commonwealth of Pennsylvania filed state criminal charges against Helms, charging him with assaulting Correction Officer Rhodes and with riot. On January 2, 1979, SCIH's Program Review Committee, which consisted of three prison officials, was convened. The Committee met to review the status of respondent's confinement in administrative segregation and to make recommendations as to his future confinement. The Committee unanimously concluded that Helms should remain in administrative segregation; affidavits of the Committee members said that the decision was based on several related concerns. Helms was seen as "a danger to staff and to other inmates if released back into general population," *id.*, at 11a; he was to be arraigned the following day on state criminal charges, *id.*, at 24a; and the Committee was awaiting information regarding his role in the riot, *id.*, at 16a. The Superintendent of SCIH personally reviewed the Program Review Committee's determination and concurred in its recommendation. *Id.*, at 15a, 18a.

The preliminary hearing on the state criminal charges against Helms was postponed on January 10, 1979, apparently due to a lack of evidence. On January 19, 1979, a second misconduct report was given to respondent; the report charged Helms with assaulting a second officer during the December 3 riot. On January 22 a Hearing Committee composed of three prison officials heard testimony from one guard and Helms. Based on this, the Committee found Helms guilty of the second misconduct charge and ordered that he be confined to disciplinary segregation for six months, effective December 3, 1978. The Committee also decided to drop the earlier misconduct charge against respondent, without determining guilt. On February 6, 1979, the State dropped criminal charges relating to the prison riot against Helms.

The Court of Appeals, reviewing these facts, concluded that Helms had a protected liberty interest in continuing to reside in the general prison population. While the court seemed to doubt that this interest could be found in the Constitution, it held that Pennsylvania regulations governing the administration of state prisons created such an interest. It then said that Helms could not be deprived of this interest without a hearing, governed by the procedures mandated in *Wolff* v. *McDonnell*, 418 U. S. 539 (1974), to determine whether such confinement was proper.[3] Being uncertain whether the hearing conducted on December 8 satisfied the *Wolff* requirements, see *supra*, at 464–465, the Court of Appeals remanded the case to the District Court for an evidentiary hearing regarding the character of that proceeding. On these same facts, we agree with the Court of Appeals that the Pennsylvania statutory framework governing the administration of state prisons gave rise to a liberty interest in respondent, but we conclude that the procedures afforded respondent were "due process" under the Fourteenth Amendment.

While no State may "deprive any person of life, liberty, or property, without due process of law," it is well settled that only a limited range of interests fall within this provision. Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States. *Meachum* v. *Fano*, 427 U. S. 215, 223–227 (1976). Respondent argues, rather weakly, that the Due Process Clause implicitly creates an interest in being confined to a general population cell, rather than the

---

[3] *Wolff* required that inmates facing disciplinary charges for misconduct be accorded 24 hours' advance written notice of the charges against them; a right to call witnesses and present documentary evidence in defense, unless doing so would jeopardize institutional safety or correctional goals; the aid of a staff member or inmate in presenting a defense, provided the inmate is illiterate or the issues complex; an impartial tribunal; and a written statement of reasons relied on by the tribunal. 418 U. S., at 563–572.

more austere and restrictive administrative segregation quarters. While there is little question on the record before us that respondent's confinement added to the restraints on his freedom,[4] we think his argument seeks to draw from the Due Process Clause more than it can provide.

We have repeatedly said both that prison officials have broad administrative and discretionary authority over the institutions they manage and that lawfully incarcerated persons retain only a narrow range of protected liberty interests. As to the first point, we have recognized that broad discretionary authority is necessary because the administration of a prison is "at best an extraordinarily difficult undertaking," *Wolff* v. *McDonnell, supra,* at 566, and have concluded that "to hold . . . that *any* substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." *Meachum* v. *Fano, supra,* at 225. As to the second point, our decisions have consistently refused to recognize more than the most basic liberty interests in prisoners. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price* v. *Johnston,* 334 U. S. 266, 285 (1948). Thus, there is no "constitutional or inherent right" to parole, *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S. 1, 7 (1979), and "the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison," *Wolff* v. *McDonnell, supra,* at 557, despite the undoubted

---

[4] As noted previously, the case is here on motions for summary judgment. Respondent submitted an affidavit that the State did not rebut, claiming that confinement to administrative segregation imposed severe hardships on him. Among other things, he alleged a denial of access to vocational, educational, recreational, and rehabilitative programs, restrictions on exercise, and confinement to his cell for lengthy periods of time.

impact of such credits on the freedom of inmates. Finally, in *Meachum* v. *Fano, supra,* at 225, the transfer of a prisoner from one institution to another was found unprotected by "the Due Process Clause in and of itself," even though the change of facilities involved a significant modification in conditions of confinement, later characterized by the Court as a "grievous loss." *Moody* v. *Daggett,* 429 U. S. 78, 88, n. 9 (1976). As we have held previously, these decisions require that "[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight." *Montanye* v. *Haymes,* 427 U. S. 236, 242 (1976). See also *Vitek* v. *Jones,* 445 U. S. 480, 493 (1980).

It is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence. The phrase "administrative segregation," as used by the state authorities here, appears to be something of a catchall: it may be used to protect the prisoner's safety, to protect other inmates from a particular prisoner, to break up potentially disruptive groups of inmates, or simply to await later classification or transfer. See 37 Pa. Code §§ 95.104 and 95.106 (1978), and n. 1, *supra.* Accordingly, administrative segregation is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration. This conclusion finds ample support in our decisions regarding parole and good-time credits. Both these subjects involve release from institutional life altogether, which is a far more significant change in a prisoner's freedoms than that at issue here, yet in *Greenholtz* and *Wolff* we held that neither situation involved an interest independently protected by the Due Process Clause. These decisions compel an identical result here.

Despite this, respondent points out that the Court has held that a State may create a liberty interest protected by the Due Process Clause through its enactment of certain statutory or regulatory measures. Thus, in *Wolff*, where we rejected any notion of an interest in good-time credits inherent in the Constitution, we also found that Nebraska had created a right to such credits. 418 U. S., at 556–557. See also *Greenholtz* v. *Nebraska Penal Inmates, supra* (parole); *Vitek* v. *Jones, supra* (transfer to mental institution). Likewise, and more relevant here, was our summary affirmance in *Wright* v. *Enomoto*, 462 F. Supp. 397 (ND Cal. 1976), summarily aff'd, 434 U. S. 1052 (1978), where the District Court had concluded that state law created a liberty interest in confinement to any sort of segregated housing within a prison. *Hughes* v. *Rowe*, 449 U. S. 5 (1980) *(per curiam)*, while involving facts similar to these in some respects, was essentially a pleading case rather than an exposition of the substantive constitutional issues involved.[5]

Respondent argues that Pennsylvania, in its enactment of regulations governing the administration of state prisons, has created a liberty interest in remaining free from the restraints accompanying confinement in administrative segregation. Except to the extent that our summary affirmance in *Wright* v. *Enomoto, supra,* may be to the contrary, we have never held that statutes and regulations governing daily operation of a prison system conferred any liberty interest in and of themselves. *Meachum* v. *Fano*, 427 U. S. 215

---

[5] We held there that it was error to dismiss for failure to state a claim a *pro se* prisoner's complaint alleging confinement to restricted quarters without a hearing. Observing that "[w]e [could not] say with assurance that petitioner can prove no set of facts in support of his claim entitling him to relief," 449 U. S., at 12–13, we expressly stated that "[o]ur discussion of this claim is not intended to express any view on its merits." *Id.*, at 12. *Rowe* is likewise factually dissimilar from this case, since in *Rowe* we also noted that "[t]here [was] no suggestion in the record that . . . emergency conditions" existed and the prisoner's "offense did not involve violence." *Id.*, at 11.

(1976), and *Montanye* v. *Haymes, supra,* held to the contrary; in *Wolff, supra,* we were dealing with good-time credits which would have actually reduced the period of time which the inmate would have been in the custody of the government; in *Greenholtz, supra,* we dealt with parole, which would likewise have radically transformed the nature of the custody to which the inmate was subject; and in *Vitek, supra,* we considered the transfer from a prison to a mental institution.

There are persuasive reasons why we should be loath to transpose all of the reasoning in the cases just cited to the situation where the statute and regulations govern the day-to-day administration of a prison system. The deprivations imposed in the course of the daily operations of an institution are likely to be minor when compared to the release from custody at issue in parole decisions and good-time credits. Moreover, the safe and efficient operation of a prison on a day-to-day basis has traditionally been entrusted to the expertise of prison officials, see *Meachum* v. *Fano, supra,* at 225. These facts suggest that regulations structuring the authority of prison administrators may warrant treatment, for purposes of creation of entitlements to "liberty," different from statutes and regulations in other areas. Nonetheless, we conclude in the light of the Pennsylvania statutes and regulations here in question, the relevant provisions of which are set forth in full in the margin,[6] that respondent did ac-

---

[6] Title 37 Pa. Code § 95.104(b)(1) (1978) provides:

"An inmate who has allegedly committed a Class I Misconduct may be placed in Close or Maximum Administrative Custody upon approval of the officer in charge of the institution, not routinely but based upon his assessment of the situation and the need for control pending application of procedures under § 95.103 of this title."

Section 95.104(b)(3) of the same Title provides:

"An inmate may be temporarily confined to Close or Maximum Administrative Custody in an investigative status upon approval of the officer in charge of the institution where it has been determined that there is a threat of a serious disturbance, or a serious threat to the individual or oth-

quire a protected liberty interest in remaining in the general prison population.

Respondent seems to suggest that the mere fact that Pennsylvania has created a careful procedural structure to regulate the use of administrative segregation indicates the existence of a protected liberty interest. We cannot agree. The creation of procedural guidelines to channel the decisionmaking of prison officials is, in the view of many experts in the field, a salutary development. It would be ironic to hold that when a State embarks on such desirable experimentation it thereby opens the door to scrutiny by the federal courts, while States that choose not to adopt such procedural provisions entirely avoid the strictures of the Due Process Clause. The adoption of such procedural guidelines, without more, suggests that it is these restrictions alone, and not those federal courts might also impose under the Fourteenth Amendment, that the State chose to require.

Nonetheless, in this case the Commonwealth has gone beyond simple procedural guidelines. It has used language of an unmistakably mandatory character, requiring that certain procedures "shall," "will," or "must" be employed, see n. 6,

---

ers. The inmate shall be notified in writing as soon as possible that he is under investigation and that he will receive a hearing if any disciplinary action is being considered after the investigation is completed. An investigation shall begin immediately to determine whether or not a behavior violation has occurred. If no behavior violation has occurred, the inmate must be released as soon as the reason for the security concern has abated but in all cases within ten days."

Finally, a State Bureau of Correction Administrative Directive states that when the State Police have been summoned to an institution:

"Pending arrival of the State Police, the institutional representative shall:

"1. Place all suspects and resident witnesses or complainants in such custody, protective or otherwise, as may be necessary to maintain security. A hearing complying with [37 Pa. Code § 95.103 (1972)] will be carried out after the investigation period. Such hearing shall be held within four (4) days unless the investigation warrants delay and in that case as soon as possible." Pa. Admin. Dir. BC–ADM 004, § IV(B) (1975).

*supra,* and that administrative segregation will not occur absent specified substantive predicates—viz., "the need for control," or "the threat of a serious disturbance." Petitioners argue, with considerable force, that these terms must be read in light of the fact that the decision whether to confine an inmate to administrative segregation is largely predictive, and therefore that it is not likely that the State meant to create binding requirements. But on balance we are persuaded that the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest.

That being the case, we must then decide whether the process afforded respondent satisfied the minimum requirements of the Due Process Clause. We think that it did. The requirements imposed by the Clause are, of course, flexible and variable dependent upon the particular situation being examined. *E. g., Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S., at 12; *Morrissey* v. *Brewer,* 408 U. S. 471, 481 (1972). In determining what is "due process" in the prison context, we are reminded that "one cannot automatically apply procedural rules designed for free citizens in an open society . . . to the very different situation presented by a disciplinary proceeding in a state prison." *Wolff* v. *McDonnell,* 418 U. S., at 560. "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell* v. *Wolfish,* 441 U. S. 520, 547 (1979). These considerations convince us that petitioners were obligated to engage only in an informal, nonadversary review of the information supporting respondent's administrative confinement, including whatever statement respondent wished to submit, within a reasonable time after confining him to administrative segregation.

. Under *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976), we consider the private interests at stake in a governmental decision, the governmental interests involved, and the value of procedural requirements in determining what process is due under the Fourteenth Amendment. Respondent's private interest is not one of great consequence. He was merely transferred from one extremely restricted environment to an even more confined situation. Unlike disciplinary confinement the stigma of wrongdoing or misconduct does not attach to administrative segregation under Pennsylvania's prison regulations. Finally, there is no indication that administrative segregation will have any significant effect on parole opportunities.

Petitioners had two closely related reasons for confining Helms to administrative segregation prior to conducting a hearing on the disciplinary charges against him. First, they concluded that if housed in the general population, Helms would pose a threat to the safety of other inmates and prison officials and to the security of the institution. Second, the prison officials believed that it was wiser to separate respondent from the general population until completion of state and institutional investigations of his role in the December 3 riot and the hearing on the charges against him. Plainly, these governmental interests are of great importance. The safety of the institution's guards and inmates is perhaps the most fundamental responsibility of the prison administration. See *Bell* v. *Wolfish, supra,* at 547; *Jones* v. *North Carolina Prisoners' Labor Union,* 433 U. S. 119, 132 (1977); *Pell* v. *Procunier,* 417 U. S. 817, 823 (1974); *Procunier* v. *Martinez,* 416 U. S. 396, 404 (1974). Likewise, the isolation of a prisoner pending investigation of misconduct charges against him serves important institutional interests relating to the insulating of possible witnesses from coercion or harm, see *infra,* at 476.

Neither of these grounds for confining Helms to administrative segregation involved decisions or judgments that

would have been materially assisted by a detailed adversary proceeding. As we said in *Rhodes* v. *Chapman*, 452 U. S. 337, 349, n. 14 (1981), "a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators." In assessing the seriousness of a threat to institutional security, prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners *inter se*, and the like. In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of other prisoners and guards even if he himself has committed no misconduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on "purely subjective evaluations and on predictions of future behavior," *Connecticut Board of Pardons* v. *Dumschat*, 452 U. S. 458, 464 (1981); indeed, the administrators must predict not just one inmate's future actions, as in parole, but those of an entire institution. Owing to the central role of these types of intuitive judgments, a decision that an inmate or group of inmates represents a threat to the institution's security would not be appreciably fostered by the trial-type procedural safeguards suggested by respondent.[7] This, and the balance of public and private interests, lead us to conclude that the Due Process Clause requires only an informal nonadversary review of evidence, discussed more fully below, in order to confine an inmate feared to be a threat to institutional security to administrative segregation.

---

[7] Indeed, we think an administrator's judgment probably would be hindered. Prison officials, wary of potential legal liability, might well spend their time mechanically complying with cumbersome, marginally helpful procedural requirements, rather than managing their institution wisely.

Likewise, confining respondent to administrative segregation pending completion of the investigation of the disciplinary charges against him is not based on an inquiry requiring any elaborate procedural safeguards. We think the closest case in point dealing with an analogous situation in the world outside of prisons is *Gerstein* v. *Pugh*, 420 U. S. 103 (1975). There, in the context of a challenge to the pretrial detainment of persons suspected of criminal acts, we held that States must "provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty," and we required that "this determination must be made by a judicial officer either before or promptly after arrest." *Id.*, at 125. We explicitly rejected the suggestion, however, that an adversary proceeding, accompanied by traditional trial-type rights, was required, and instead permitted an informal proceeding designed to determine whether probable cause existed to believe that the detained person had committed a crime. *Id.*, at 119–123.

While *Gerstein* was grounded in the Fourth Amendment, we think it provides a useful point of departure with respect to the due process question raised here. *Mathews* v. *Eldridge, supra,* at 335, again suggests the points at which *Gerstein* is inapposite in the prison context. As our discussion above suggests, the private interest at stake here is far less weighty than that at issue in *Gerstein*, which involved removing a suspect from unrestricted liberty in open society and placing him in an institution. In contrast, as noted above, Helms was merely transferred from an extremely restricted environment to an even more confined situation. Under the *Mathews* formula, respondent has a far less compelling claim to procedural safeguards than did the pretrial detainees in *Gerstein*. Likewise, weighty governmental interests are at stake. To be sure, *Gerstein* involved a situation in which a real possibility existed that the suspected criminal would flee from justice; it is unlikely, to say the least, that confinement to administrative segregation is nec-

essary for this purpose where an inmate has been charged with misconduct. Yet the State has other important interests. For example, it must protect possible witnesses—whose confinement leaves them particularly vulnerable—from retribution by the suspected wrongdoer, and, in addition, has an interest in preventing attempts to persuade such witnesses not to testify at disciplinary hearings. These considerations lead us to conclude that while general patterns of the *Gerstein* procedures should be our guide, some of the elements required in that case are unnecessary in the much more informal context of prison officials who propose to confine an inmate to administrative segregation pending completion of an investigation against him.

We think an informal, nonadversary evidentiary review is sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him. An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.[8] This informal procedure permits a reasonably accurate assessment of probable cause to believe that misconduct occurred, and the "value [of additional 'formalities and safeguards'] would be too slight to justify holding, as a matter of constitutional principle" that they must be adopted, *Gerstein* v. *Pugh, supra,* at 122.

---

[8] The proceeding must occur within a reasonable time following an inmate's transfer, taking into account the relatively insubstantial private interest at stake and the traditionally broad discretion of prison officials.

Measured against these standards we are satisfied that respondent received all the process that was due after being confined to administrative segregation. He received notice of the charges against him the day after his misconduct took place. Only five days after his transfer to administrative segregation a Hearing Committee reviewed the existing evidence against him, including a staff member's statement that "[t]his inmate was a member of an organized plot and did actively involve himself with at least 10 other inmates in the assault upon 5 corrections officers in 'C' Block and attempted to break thru the 'C' grill to the Control Center to disrupt the normal institution routine by usurping the authority of institution officials." App. 38a. While the Court of Appeals may have been correct that the record does not clearly demonstrate that a *Wolff* hearing was held, it does show that he had an opportunity to present a statement to the Committee. As noted previously, Helms acknowledged on the misconduct form that he "had the opportunity to have [his] version reported as part of the record"; we see no reason to question the accuracy of his statement. This proceeding plainly satisfied the due process requirements for continued confinement of Helms pending the outcome of the investigation.[9]

---

[9] Of course, administrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates. This review will not necessarily require that prison officials permit the submission of any additional evidence or statements. The decision whether a prisoner remains a security risk will be based on facts relating to a particular prisoner—which will have been ascertained when determining to confine the inmate to administrative segregation—and on the officials' general knowledge of prison conditions and tensions, which are singularly unsuited for "proof" in any highly structured manner. Likewise, the decision to continue confinement of an inmate pending investigation of misconduct charges depends upon circumstances that prison officials will be well aware of—most typically, the progress of the investigation. In both situations, the ongoing task of operating the institution will require the prison officials to consider a wide range of administrative considerations; here, for example, petitioners had to consider prison tensions in the aftermath of the De-

478

Accordingly, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE BLACKMUN, concurring in part and dissenting in part.

The Court's prior cases of course recognize that a valid criminal conviction and sentence extinguish a defendant's otherwise protected right to be free from confinement. *E. g., Connecticut Board of Pardons* v. *Dumschat,* 452 U. S. 458, 464 (1981); *Vitek* v. *Jones,* 445 U. S. 480, 493 (1980); *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S. 1, 7 (1979); *Meachum* v. *Fano,* 427 U. S. 215, 224 (1976). Although prison inmates retain a residuum of liberty, see *Wolff* v. *McDonnell,* 418 U. S. 539, 555–556 (1974), this liberty is not infringed by conditions of confinement that are "within the normal limits or range of custody which the conviction has authorized the State to impose." *Meachum* v. *Fano,* 427 U. S., at 225; see *Montanye* v. *Haymes,* 427 U. S. 236, 242 (1976); *Vitek* v. *Jones,* 445 U. S., at 493. In *Meachum* and *Montanye,* we held that certain prison transfers were "within the normal limits or range of custody" even though conditions of confinement were more severe in the prisons to which the inmates were transferred. Because I believe that a transfer to administrative segregation within a prison likewise is within the normal range of custody, I agree with the Court that respondent has not been deprived of "an interest independently protected by the Due Process Clause," *ante,* at 468.

I also agree that the Pennsylvania statutes and prison regulations at issue in this case created an entitlement not to

cember 3 riot, the ongoing state criminal investigation, and so forth. The record plainly shows that on January 2 a Program Review Committee considered whether Helms' confinement should be continued, App. 13a–15a. This review, occurring less than a month after the initial decision to confine Helms to administrative segregation, is sufficient to dispel any notions that the confinement was a pretext.

be placed in administrative segregation without due process. These statutes and regulations are similar to the ones at issue in *Hughes* v. *Rowe*, 449 U. S. 5 (1980), and *Wright* v. *Enomoto*, 462 F. Supp. 397 (ND Cal. 1976), summarily aff'd, 434 U. S. 1052 (1978), and our dispositions of those cases made clear that a liberty interest was created. We also found a state-created liberty interest in *Greenholtz, supra,* even though the statutes at issue there permitted parole decisions to be based on partially subjective and predictive criteria. In cases in which we have declined to find a state-created liberty interest, we have noted that state law permitted prison transfers to be made "for whatever reason or for no reason at all," *Meachum* v. *Fano*, 427 U. S., at 228; that state law "impose[d] no conditions on the discretionary power to transfer," *Montanye* v. *Haymes*, 427 U. S., at 243; or that state law gave a Board of Pardons "unfettered discretion," *Dumschat*, 452 U. S., at 466. This is not such a case.

Having found a state-created liberty interest, I cannot agree with the Court that the procedures used here comported with due process. Accordingly, I join Parts II and III of JUSTICE STEVENS' dissenting opinion.

JUSTICE STEVENS, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, and with whom JUSTICE BLACKMUN joins as to Parts II and III, dissenting.

When respondent Helms was transferred to "administrative segregation," he was placed in solitary confinement in B-Block at the State Correctional Institution at Huntingdon, Pennsylvania. The conditions in B-Block are significantly more restrictive than those experienced by inmates in the general prison population.[1] Indeed, in all material respects

---

[1] In an uncontroverted affidavit, respondent Helms described those conditions as follows:

"While confined in segregation I had no access to vocational, educational, recreational, and rehabilitative programs as I would have had while out in the general population. Exercise was limited to between five and ten minutes a day and was often only three or four days a week. Showers

conditions in administrative custody are the same as those in disciplinary segregation.[2]   The reasons for placing one inmate in administrative and another in punitive segregation may be different, and the periods of confinement may vary, but the Court properly assumes for purposes of this case that "the conditions in the two types of confinement are substantially identical."   *Ante,* at 463, n. 1.

None of the three substantive charges against respondent Helms has ever been substantiated in a valid manner.[3]

---

were virtually nonexistent in segregation in December and January.   The changing of clothes was also only once or twice a week while I could have changed more often in population.   Had I been in general population I would have had access to various exercise facilities such as the gym and the yard and would have been able to do this for most of the time out of my cell which would have been approximately 14 hours a day.   While in segregation I only got out of my cell a few minutes for exercise, showers and an occasional visit.   I was virtually confined there 24 hours a day otherwise." App. 35a.

The State has not challenged the factual accuracy of this description.

[2] Compare 37 Pa. Code § 95.106(1) and § 95.106(2) (1978) (virtually identical language in regulations describing administrative custody and disciplinary custody); see also Tr. of Oral Arg. 9–10 (Attorney General's response to question).

Indeed, the record shows that, because of the large number of prisoners placed in administrative custody after the December 3, 1978, riot, some individuals including Helms "were placed in an area otherwise designated as disciplinary custody close.   The physical attributes of these cells are similar to those of administrative custody . . . ."   Affidavit submitted by Dennis R. Erhard, Deputy Superintendent for Treatment at the State Correctional Institution at Huntingdon, in support of defendants' motion to dismiss or for summary judgment.   App. 12a.   Mr. Erhard served as a member of the Program Review Committee.   See also *id.,* at 14a (record of the January 2, 1979, review proceeding, describing Helms' location as Disciplinary Custody Close); *id.,* at 16a (affidavit by another member of the Program Review Committee stating that Helms was "in an area designated as disciplinary custody" even though it was not a disciplinary placement).

[3] The state criminal charges filed on December 11, 1978, were voluntarily abandoned at the preliminary hearing on February 6, 1979.   The first misconduct charge of assaulting a correctional officer, filed on Decem-

Nevertheless, he was held in "administrative segregation" for over seven weeks—from the evening of December 3, 1978, until January 22, 1979—before he received an evidentiary hearing, and he was then sentenced to six months in "disciplinary custody." Despite the severity of conditions in solitary confinement, and the admitted differences between segregated custody and the general prison population, petitioners urge us to hold that the transfer of an inmate into administrative segregation does not deprive him of any interest in liberty protected by the Due Process Clause. The Court correctly rejects this contention today. It does so, however, for reasons that do not withstand analysis. It then concludes that the procedures afforded by prison authorities in this case "plainly satisfied the due process requirements for continued confinement of Helms pending the outcome of the investigation." *Ante,* at 477. I cannot agree.

## I

The principal contention advanced by petitioners in this Court is that the Federal Constitution imposes no procedural limitations on the absolute discretion of prison officials to place any inmate in administrative segregation and to keep him there, if they choose, for the entire period of his confinement.[4] Petitioners argue that a transfer into solitary confinement is merely one example of various routine decisions

---

ber 4, 1978, was never sustained. *Id.,* at 31a. In addition, the second misconduct charge of assaulting a different correctional officer, filed on January 19, 1979, must be regarded as still unproved. The Court of Appeals held that due process was violated at the January 22, 1979, hearing that found respondent guilty of the second misconduct, because the finding was supported only by uncorroborated hearsay testimony—"literally, next to no evidence." 655 F. 2d 487, 502 (CA3 1981). Petitioners have not challenged that holding. Brief for Petitioners 7, n. 6.

[4] Tr. of Oral Arg. 17. There is no contention in this case that conditions in administrative segregation at Huntingdon violated the Eighth Amendment's prohibition against cruel and unusual punishments. If such a violation existed, the Constitution would impose substantive rather than procedural limits on transfers into segregated status.

made on a day-to-day basis by prison authorities, regarding "place of confinement, both as to which facility is appropriate and within the appropriate facility which cell block or housing unit is appropriate; his job assignment; the potential for freedom of movement; and the possibility and variety of educational and vocational opportunities available to him." Brief for Petitioners 11–12. According to petitioners, operational decisions such as these do not raise any constitutional question because prison officials need wide latitude to operate their institutions in a safe and efficient manner.

The Court properly rejects the contention that the Due Process Clause is simply inapplicable to transfers of inmates into administrative segregation. It holds that respondent's transfer from the general population into administrative confinement was a deprivation of liberty that must be accompanied by due process of law. The majority's reasoning in support of this conclusion suffers, however, from a fundamental flaw. In its view, a "liberty interest" exists only because Pennsylvania's written prison regulations[5] display a magical combination of "substantive predicates" and "explicitly mandatory language." *Ante*, at 472. This analysis attaches no significance either to the character of the conditions of confinement or to actual administrative practices in the institution. Moreover, the Court seems to assume that after his conviction a prisoner has, in essence, no liberty save that created, in writing, by the State which imprisons him. Under this view a prisoner crosses into limbo when he enters into penal confinement. He might have some minimal freedoms if the State chooses to bestow them; but such freedom as he has today may be taken away tomorrow.

This approach, although consistent with some of the Court's recent cases,[6] is dramatically different from the anal-

[5] These regulations were issued in compliance with a consent decree in federal-court litigation. *Imprisoned Citizens Union* v. *Shapp*, C. A. 70–3054 (ED Pa., May 22, 1978). See 8 Pa. Bull. 2682 (1978).

[6] See *Connecticut Board of Pardons* v. *Dumschat*, 452 U. S. 458, 463–467 (1981); *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1, 11–12

ysis in *Wolff* v. *McDonnell*, 418 U. S. 539 (1974). In *Wolff*, the Court squarely held that every prisoner retains a significant residuum of constitutionally protected liberty following his incarceration. Though the prisoner's "rights may be diminished by the needs and exigencies of the institutional environment, a prisoner is not wholly stripped of constitutional protections when he is imprisoned for crime. There is no iron curtain drawn between the Constitution and the prisons of this country. . . . [Prisoners] may not be deprived of life, liberty, or property without due process of law." *Id.*, at 555–556.

The source of the liberty recognized in *Wolff* is not state law, nor even the Constitution itself. Rather, it is plain that

"neither the Bill of Rights nor the laws of sovereign States create the liberty which the Due Process Clause protects. The relevant constitutional provisions are limitations on the power of the sovereign to infringe on the liberty of the citizen . . . . Of course, law is essential to the exercise and enjoyment of individual liberty in a complex society. But it is not the source of liberty, and surely not the exclusive source.

"I had thought it self-evident that all men were endowed by their Creator with liberty as one of the cardinal unalienable rights. It is that basic freedom which the Due Process Clause protects, rather than the particular rights or privileges conferred by specific laws or regulations." *Meachum* v. *Fano*, 427 U. S. 215, 230 (1976) (STEVENS, J., dissenting).[7]

_____

(1979); *Meachum* v. *Fano*, 427 U. S. 215, 225–228 (1976); *Montanye* v. *Haymes*, 427 U. S. 236, 243 (1976). Although I believe these cases were erroneously decided, I am also persuaded that they do not control the present case. None of them dealt with transfers into solitary confinement. See *Meachum, supra*, at 222; *Montanye, supra*, at 238.

[7] See *United States ex rel. Miller* v. *Twomey*, 479 F. 2d 701, 712–713 (CA7 1973) (Stevens, J.) (footnote omitted) ("The restraints and the punishment which a criminal conviction entails do not place the citizen beyond the ethical tradition that accords respect to the dignity and intrinsic worth of every individual. 'Liberty' and 'custody' are not mutually exclusive

484

Identifying the "liberty" that survives in a closely controlled prison environment is understandably more difficult than in the world at large. For it is obvious that "[l]awful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen, a 'retraction justified by the considerations underlying our penal system.'" *Wolff*, *supra*, at 555, quoting *Price* v. *Johnston*, 334 U. S. 266, 285 (1948). But I remain convinced that an inmate "has a protected right to pursue his limited rehabilitative goals, or at the minimum, to maintain whatever attributes of dignity are associated with his status in a tightly controlled society. It is unquestionably within the power of the State to change that status, abruptly and adversely; but if the change is sufficiently grievous, it may not be imposed arbitrarily. In such case due process must be afforded." *Meachum, supra*, at 234 (STEVENS, J., dissenting). Thus, the relevant question in this case is whether transfer into administrative segregation constitutes a "sufficiently grievous" change in a prisoner's status to require the protection of "due process." See *Vitek* v. *Jones*, 445 U. S. 480, 492 (1980), quoting *Miller* v. *Vitek*, 437 F. Supp. 569, 573 (Neb. 1977); *Morrissey* v. *Brewer*, 408 U. S. 471, 481 (1972), quoting *Joint Anti-Fascist Refugee Committee* v. *McGrath*, 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring).

In answering this question it is useful to consider the residuum of liberty that the ordinary citizen enjoys in any organized society. All general laws—whether designed to protect the health of the community, to control urban traffic, to improve the environment, or to raise tax revenues—curtail the individual's freedom to do as he pleases. Thus the residuum of liberty is far removed from a license to gratify every whim without restraint. It is more akin to the characteristic of "independence," which played a special role in our early history. Consider Professor Dworkin's discussion of this term:

concepts"), cert. denied *sub nom. Gutierrez* v. *Department of Public Safety of Illinois*, 414 U. S. 1146 (1974).

> "Mill saw independence as a further dimension of equality; he argued that an individual's independence is threatened, not simply by a political process that denies him equal voice, but by political decisions that deny him equal respect. Laws that recognize and protect common interests, like laws against violence and monopoly, offer no insult to any class or individual; but laws that constrain one man, on the sole ground that he is incompetent to decide what is right for himself, are profoundly insulting to him. They make him intellectually and morally subservient to the conformists who form the majority, and deny him the independence to which he is entitled. Mill insisted on the political importance of these moral concepts of dignity, personality, and insult. It was these complex ideas, not the simpler idea of license, that he tried to make available for political theory . . . ."
> R. Dworkin, Taking Rights Seriously 263 (1977).

Ordinarily the mere fact that the existence of a general regulation may significantly impair individual liberty raises no question under the Due Process Clause.[8] But the Clause is implicated when the State singles out one person for adverse treatment significantly different from that imposed on the community at large. For an essential attribute of the liberty protected by the Constitution is the right to the same kind of treatment as the State provides to other similarly situated persons.[9] A convicted felon, though he is

---

[8] There are, of course, particular liberties that have constitutional status in their own right, such as freedom of speech and the free exercise of religion, whose deprivation by a State on a classwide as well as an individual basis may violate the Due Process Clause of the Fourteenth Amendment.

[9] "Liberty under law extends to the full range of conduct which the individual is free to pursue, and it cannot be restricted except for a proper governmental objective." *Bolling* v. *Sharpe,* 347 U. S. 497, 499–500 (1954).

"While this Court has not attempted to define with exactness the liberty . . . guaranteed [by the Fourteenth Amendment], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of

properly placed in a disfavored class, retains this essential right.[10]

Thus, for a prisoner as for other persons, the grievousness of any claimed deprivation of liberty is, in part, a relative matter: one must compare the treatment of the particular prisoner with the customary, habitual treatment of the population of the prison as a whole. In general, if a prisoner complains of an adverse change in conditions which he shares with an entire class of his fellow prisoners as part of the day-to-day operations of the prison, there would be no reason to find that he has been deprived of his constitutionally protected liberty.[11] But if a prisoner is singled out for disparate treatment and if the disparity is sufficiently severe, his liberty is at stake.[12]

---

the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Meyer* v. *Nebraska*, 262 U. S. 390, 399 (1923), quoted in *Board of Regents* v. *Roth*, 408 U. S. 564, 572 (1972).

[10] See *Wolff* v. *McDonnell*, 418 U. S. 539, 556 (1974); cf. *Lee* v. *Washington*, 390 U. S. 333 (1968) (statutes requiring racial segregation in prisons and jails violate Fourteenth Amendment).

[11] This category would include some if not all of the day-to-day decisions listed by the petitioners, see Brief for Petitioners 11–12. When an entire class is affected by a change, individual prisoners are neither more acutely affected by it than other members of their class nor uniquely able to bring personal knowledge to bear on the appropriateness of its implementation. Therefore the reasons for the due process requirement of some kind of hearing are absent. There may, of course, be other constitutional issues, such as the Eighth Amendment's proscription of cruel and unusual punishments, or the First Amendment's guarantee of religious freedom.

[12] Although I disagree with the Court's assumption that the State "creates" a prisoner's interest in liberty, I recognize, of course, that the State does have the power to limit the scope of the liberty that remains after incarceration. Just as it may impose either a long or a short term of confinement, so may it establish more or less severe conditions of confinement. Whether by formal written guidelines or by consistent unwritten practice, the State establishes the base line of how it customarily treats the

In this case, by definition, the institutional norm is confinement in the "general prison population."[13] The deprivation of which respondent complains is transfer to "administrative segregation"—that is, solitary confinement—which by its nature singles out individual prisoners. That confinement was not specified by the terms of his initial criminal sentence. Not only is there a disparity, the disparity is drastic.[14] It is concededly as serious as the difference between confinement in the general prison population and "disciplinary segregation." See *supra*, at 479–480, and n. 2. As the District Court wrote in *Wright* v. *Enomoto*, 462 F. Supp. 397, 402 (ND Cal. 1976), summarily aff'd, 434 U. S. 1052 (1978):

---

prison population. In my opinion, it does not matter whether the State uses a particular form of words in its laws or regulations, or indeed whether it has adopted written rules at all.

Hence, as we noted in *Wolff*, the State is not required to allow prisoners good-time credits. But if it establishes such a system, it may not arbitrarily deprive a prisoner of these credits on the ground that the prisoner has engaged in serious misbehavior, unless its procedures for so doing are constitutionally adequate. *Wolff*, *supra*, at 556–557. Similarly, an offender has a liberty interest in parole release or probation "derived solely from the existence of a system that permits criminal offenders to serve their sentences on probation or parole." *Greenholtz*, 442 U. S., at 24–25 (MARSHALL, J., dissenting in part); see *id.*, at 30–31. Due process must be satisfied when a prisoner is singled out and denied parole. See also *Connecticut Board of Pardons* v. *Dumschat*, 452 U. S., at 471, and n. 5 (STEVENS, J., dissenting) (when 75% of all life inmates receive commutation of life sentence, each life inmate has a liberty interest in commutation).

[13] See Brief for Respondent 32–34 (briefly setting forth history of penitentiaries; initially solitary confinement was the norm, but gradually authorities realized the advantages of the congregated system).

[14] The Commonwealth's own prison regulations make clear how substantial the disparity is. Title 37 Pa. Code § 95.107(a)(2) (1978) provides: "The inmates therein shall have all the rights and privileges accorded to the general population except for freedom to move about the institution, freedom to engage in programs with the general population, the use of civilian clothing, the use of items specifically found by the Program Review Committee to be a security hazard . . . ."

"When a prisoner is transferred from the general prison population to the grossly more onerous conditions of maximum security, be it for disciplinary or for administrative reasons, there is severe impairment of the residuum of liberty which he retains as a prisoner—an impairment which triggers the requirement for due process safeguards." [15]

In this case, the Court's exclusive focus on written regulations happens to lead it to the conclusion that there is a "liberty interest." I agree that the regulations are relevant: by limiting the substantive reasons for a transfer to administrative segregation and by establishing prescribed procedures, these regulations indicate that the State recognizes the substantiality of the deprivation. They therefore provide evidentiary support for the conclusion that the transfer affects a constitutionally protected interest in liberty. But the regulations do not *create* that interest. Even in their absence due process safeguards would be required when an inmate's liberty is further curtailed by a transfer into administrative custody that is the functional equivalent of punitive isolation.

## II

The "touchstone of due process," as we pointed out in *Wolff* v. *McDonnell,* is "protection of the individual against arbitrary action of government." 418 U. S., at 558. Pennsylvania may not arbitrarily place a prisoner in administrative segregation. *Hughes* v. *Rowe,* 449 U. S. 5, 9 (1980). The majority agrees with this general proposition, but I believe its standards guarding against arbitrariness fall short of what the Constitution requires.

---

[15] See *Wolff, supra,* at 571–572, n. 19 (due process applies to transfer to solitary confinement for major misconduct because it "represents a major change in the conditions of confinement"); cf. *Montanye* v. *Haymes,* 427 U. S., at 242 (question is whether the conditions or degree of confinement to which the prisoner is subjected is "within the sentence imposed upon him").

First, the majority declares that the Constitution is satisfied by an initial proceeding[16] with minimal participation by the inmate who is being transferred into administrative custody. According to the Court: "An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective." *Ante*, at 476. Applying this standard, it declares that the proceeding on December 8, 1979, "plainly satisfied the due process requirements for continued confinement of Helms pending the outcome of the investigation," *ante*, at 477, even though the record does not clearly show whether respondent was present at the Hearing Committee review.

I agree with the Court that the Constitution does not require a hearing with all of the procedural safeguards set forth in *Wolff* v. *McDonnell* when prison officials initially decide to segregate an inmate to safeguard institutional security or to

---

[16] The Court of Appeals recognized that, in the emergency conditions on December 3, 1978, prison officials were justified in placing respondent in administrative segregation without a hearing. Respondent does not contend otherwise. The Due Process Clause allows prison officials flexibility to cope with emergencies. But petitioners acknowledge that the disturbance was "quelled" the same day, Brief for Petitioners 3, and that, within a day or two after the December 3, 1978, prison riot, conditions had returned completely to normal. See App. 55a–56a, 68a. At that point the emergency rationale for administrative segregation without a hearing had expired. The Due Process Clause then required a prompt proceeding to determine whether continued administrative segregation was justified. Cf. *Hughes* v. *Rowe*, 449 U. S. 5, 11 (1980) ("Segregation of a prisoner without a prior hearing may violate due process if the postponement of procedural protections is not justified by apprehended emergency conditions"). Yet Helms was not accorded any procedural safeguards whatsoever until five days after the riot—another violation of his due process rights.

conduct an investigation of an unresolved misconduct charge. But unlike the majority, I believe that due process does require that the inmate be given the opportunity to present his views in person to the reviewing officials. As many prisoners have little education, limiting an inmate to a written statement is unlikely to provide a "meaningful opportunity to be heard" in accordance with due process principles. See *Goldberg* v. *Kelly*, 397 U. S. 254, 267–269 (1970).[17]

Of greater importance, the majority's due process analysis fails to provide adequate protection against arbitrary continuation of an inmate's solitary confinement.[18] The opinion recognizes that "[p]rison officials must engage in some sort of periodic review of the confinement of such inmates." *Ante*, at 477, n. 9. It thus recognizes that the deprivation of liberty in the prison setting is a continuous process rather than an isolated event.[19] But the Court requires only minimal re-

---

[17] Indeed, petitioners do not contend that a face-to-face presentation by the inmate would be unduly burdensome. Their brief cites *Goss* v. *Lopez*, 419 U. S. 565 (1975), as a model of appropriate procedure, noting that there the Court did not require an "elaborate hearing" before a neutral party, "but simply 'an informal give-and-take between student and disciplinarian' which gives the student 'an opportunity to explain his version of the facts.'" Brief for Petitioners 27–28, quoting *Ingraham* v. *Wright*, 430 U. S. 651, 693 (1977) (WHITE, J., dissenting).

[18] Unlike disciplinary custody, which is imposed for a fixed term, in practice administrative custody sometimes continues for lengthy or indefinite periods. See *Ruiz* v. *Estelle*, 503 F. Supp. 1265, 1365, 1367 (SD Tex. 1980) ("months or even years"); *Mims* v. *Shapp*, 457 F. Supp. 247, 249 (WD Pa. 1978) (five years); *United States ex rel. Hoss* v. *Cuyler*, 452 F. Supp. 256 (ED Pa. 1978) (more than five years); *Wright* v. *Enomoto*, 462 F. Supp. 397, 403–404 (ND Cal. 1976) (various instances up to a year).

[19] As the Eighth Circuit wrote in 1975:

"Conditions in prisons change as they do everywhere else, and a reason for administrative segregation of an inmate that is valid today may not necessarily be valid six months or a year in the future.

"Since there must be a valid and subsisting reason for holding an inmate in segregation, we agree with the district court that where an inmate is held in segregation for a prolonged or indefinite period of time due process requires that his situation should be reviewed periodically in a meaningful

view procedures; prison officials need not permit the submission of any additional evidence or statements and need not give the inmate a chance to present his position. It is constitutionally sufficient, according to the majority, that administrative segregation not be a pretext for indefinite confinement. In my view, the Due Process Clause requires a more searching review of the justifiability of continued confinement.

The Court relies on two major justifications for respondent's transfer into solitary confinement: institutional security and the pendency of investigations into respondent's behavior on December 3, 1978. Each of these justifications may serve important governmental interests. See *Hughes* v. *Rowe*, 449 U. S., at 13, n. 12. But it cannot fairly be assumed that either rationale, though it might initially be adequate, remains valid or sufficient indefinitely.[20] Nor can it

---

way and by relevant standards to determine whether he should be retained in segregation or returned to population." *Kelly* v. *Brewer*, 525 F. 2d 394, 400 (CA8 1975).

Accord, *Drayton* v. *Robinson*, 519 F. Supp. 545, 551–552 (MD Pa. 1981); *Ruiz* v. *Estelle*, *supra*, at 1366; *United States ex rel. Hoss* v. *Cuyler*, *supra*, at 290–291.

See Brief for United States as *Amicus Curiae* 30: "Since the imposition of administrative segregation generally is a response to a particular confluence of circumstances occurring in a prison at a given time, fairness and effectiveness would seem to be best served by reassessments of the situation at regular intervals to assure that an inmate is released from the restrictive confinement as soon as the 'reasons for placement cease to exist.'"

[20] Some of the provisions of Pennsylvania's own regulations appear to recognize that the investigative rationale does not support indefinite solitary confinement. When a prisoner is confined as a result of a general institutional disturbance or incident, because officials determine that there is a threat of a serious disturbance or a serious threat to the individual or others, the regulations provide: "An investigation shall begin immediately to determine whether or not a behavior violation has occurred. If no behavior violation has occurred, the inmate must be released as soon as the reason for the security concern has abated but in all cases within ten days." 37 Pa. Code § 95.104(b)(3) (1978). When a prisoner is placed in administrative custody pending investigation by the state police, Administrative

fairly be assumed that prison officials can properly judge the continued existence of either rationale without gathering fresh information and allowing the inmate to state his own case in person.

The majority assumes that the facts needed to decide whether a particular prisoner remains a security risk "will have been ascertained when determining to confine the inmate to administrative segregation." *Ante*, at 477, n. 9. This assertion simply ignores the passage of time. Even if Helms was a threat to safety on December 8, 1978, it cannot be taken for granted that he was still a threat to safety on January 8, 1979—or that, if there had been no hearing on January 22, he would still have been a threat to safety a year later. Conditions—including Helms' own attitudes, the attitudes of other prisoners toward him and toward each other, and the disruptions caused by the riot—simply do not remain static.

The majority acknowledges that periodic reviews should consider "the progress of the investigation." But it gives no guidance on the significance of this factor. In my view, the mere notation on a record, "there is an ongoing investigation," should not automatically validate the continuation of solitary confinement. As the Court held in *Hughes* v. *Rowe*, *supra*, the Due Process Clause does not countenance "automatic investigative segregation of all inmate suspects." *Id.*, at 13, n. 12.[21] Investigations take varying forms. An active

---

Directive BC–ADM 004, § IV(B)(1) (1975) requires that a hearing "will be carried out after the investigation period. Such hearing shall be held within four (4) days unless the investigation warrants delay and in that case as soon as possible." When a prisoner is confined pending a hearing on a misconduct charge, the inmate shall be informed in writing of the charge and "given a specific date for a hearing which shall be held no less than 24 hours after receipt of this notice but within six days." 37 Pa. Code § 95.103(d)(1) (1978).

[21] The record in *Hughes* v. *Rowe* did not show that petitioner's segregation was based on specific "investigative concerns [that] might, in particular cases, justify prehearing segregation." 449 U. S., at 13, n. 12. We

investigation involving pursuit of leads among prisoners may justify continued segregation of the suspected inmate, in order to protect potential witnesses from intimidation or influence. But segregation might not be proper if the investigative file is merely being kept open in the hope that something else might turn up.[22] In such event there is a possibility that a prisoner might be kept in segregation simply because prison officials believe that he should be punished, even though there is insufficient evidence to support a misconduct charge at a disciplinary hearing.[23] The lengthier the period of administrative detention, the more likely it may be that "investigation" is merely a pretext. Therefore, due process demands periodic reviews that have genuine substance—not mere paper-shuffling.[24]

---

therefore reversed the lower court's dismissal for failure to state a claim and remanded for further factfinding proceedings.

[22] In an affidavit, Lt. Buddy B. Kyler, who prepared the January 18, 1979, misconduct charge, stated that, by January 4, 1979, he had received the notarized statement from an inmate informant which was the sole evidence against respondent at the hearing 18 days later. He did not write a misconduct report at the time, because he was awaiting the preliminary hearing on the pending state criminal charges. "In addition, more information could have come to light at the preliminary hearing revealing additional acts of assault or institutional misconduct by plaintiff which should be handled at a single administrative hearing." On January 18, he wrote a misconduct report because an Assistant Attorney General recommended that administrative proceedings be completed even though the preliminary hearing had not taken place. App. 82a–84a (affidavit submitted in support of defendants' motion for summary judgment). It is not at all self-evident that this delay was justified.

[23] Cf. *Wright* v. *Enomoto*, 462 F. Supp., at 400–401. The plaintiffs had been placed in administrative solitary confinement for a variety of reasons, including "becoming too militant" and spending too much time in the yard with other Black Muslims, being an influential member of the Mexican prison community and having "leadership qualities," and being "suspected of being a leader in Nuestra Familia."

[24] Moreover, once investigation has been completed, the pending misconduct charge should be promptly adjudicated. Cf. *Moody* v. *Daggett*, 429 U. S. 78, 91–92 (1976) (STEVENS, J., dissenting) (constitutional right to a

494

At each periodic review, I believe due process requires that the prisoner be allowed to make an oral statement about the need for and the consequences of continued confinement. Concededly some of the information relevant to a decision whether to continue confinement will be beyond the reach of a prisoner who has been held in segregated custody, including conditions in the general prison population and the progress of an ongoing investigation. But the prisoner should have the right to be present in order to explain his current attitude toward his past activities and his present circumstances, and the impact of solitary confinement on his rehabilitation program and training.[25] These factors may change as the period of confinement continues.

Further, if the decisionmaker decides to retain the prisoner in segregation, I believe he should be required to explain his reasons in a brief written statement which is retained in the file and given to the prisoner. As JUSTICE MARSHALL has written in a related prison context, this requirement would direct the decisionmaker's focus "to the relevant . . . criteria and promote more careful consideration of the evidence. It would also enable inmates to detect and correct inaccuracies that could have a decisive impact. And the obligation to justify a decision publicly would provide the

---

fair hearing on parole revocation includes the right to a prompt hearing; due process is violated by putting a person under the cloud of an unresolved charge for an indeterminate period).

[25] In addition to worsening his conditions of confinement, respondent alleged that detention in solitary confinement might indirectly affect his parole opportunities by depriving him of the opportunity to participate in rehabilitation programs. Brief for Respondent 48, n. 35; App. 35a; see Brief for State Bar of Michigan, Prisons and Corrections Committee, as Amicus Curiae 11 (prisoner in extended administrative segregation loses his assigned general population cell and work or program assignments). Petitioners do not directly answer this assertion, but generally state that administrative custody has no effect on parole or prerelease status. Tr. of Oral Arg. 10.

assurance, critical to the appearance of fairness, that the Board's decision is not capricious." *Greenholtz* v. *Nebraska Penal Inmates*, 442 U. S. 1, 38–41 (1979) (dissenting in part) (footnote omitted). A written statement of reasons would facilitate administrative and judicial review[26] and might give the prisoner an opportunity to improve his conduct.

Neither a right to personal appearance by the prisoner nor a requirement of written reasons would impose an undue burden on prison officials. It is noteworthy that these procedural safeguards are provided in regulations governing both the Pennsylvania and federal prison systems.[27] Given the

---

[26] The Pennsylvania regulations provide for administrative review, upon the inmate's request, of transfers into segregated confinement, 37 Pa. Code §§ 95.103(g)(2), 95.103(h) (1978); see also App. 31a, 41a (notification to Helms of Hearing Committee actions, informing him of opportunity to seek review). In addition, petitioners' brief states that "arbitrary action by prison officials is violative of substantive due process and, therefore, subject to full judicial review." Brief for Petitioners 17.

[27] Title 37 Pa. Code § 95.103(g)(4) (1978) requires that a Program Review Committee, composed of the Deputy Superintendent for Operations, the Deputy Superintendent for Treatment Services, and the Classification and Treatment Supervisor, must

"interview in person at least once every 30 days, those inmates detained in Administrative Custody or Disciplinary Custody. The determination of whether continued confinement is warranted will be based upon a review of the counselor's notes and recommendations, psychological and psychiatric reports when available, recommendations by other staff and their written observations regarding his attitudes and actions, and his attitude and actions during the interview. . . . When the Program Review Committee determines that continued confinement is warranted, the inmate shall be given a written statement of the decision and its rationale."

In addition, the regulations mandate a weekly status review of each inmate in restrictive custody, to determine whether continuation of such custody is appropriate and necessary. The prisoner is not present at these weekly reviews, which are based on the notes and recommendations of the counselor and other entries in the inmate's record. § 95.103(g)(3). Finally, every 30 days the Superintendent is required personally to review

importance of the prisoner's interest in returning to the general prison population, the benefits of additional procedural safeguards, and the minimal burden on prison officials, I am convinced that the Due Process Clause requires more substantial periodic reviews than the majority acknowledges.

## III

Unfortunately, today's majority opinion locates the due process floor at a level below existing procedures in Pennsylvania. The Court reverses the judgment of the Court of Appeals, and thus endorses the District Court's summary judgment in favor of petitioners. In my view, summary judgment is inappropriate because at least three issues of material fact remain unresolved. First, there has been no finding whether Helms had a constitutionally adequate opportunity to present his views at the initial proceeding on December 8, 1978. As the Court today acknowledges, it is not entirely clear from the record whether respondent appeared in person before the Hearing Committee on December 8. *Ante,* at 464–465. Second, the record does not ade-

the case of each inmate separated from the general population for 30 days or more, and he must retain a written report of his findings in each such case. § 95.107(f).

The federal prison system appears to follow similar periodic review procedures. See Brief for United States as *Amicus Curiae* 29–30:

"After an inmate's first in-person review, he is afforded a record review (at which he does not appear) every seven days and further in-person reviews at least every 30 days. In connection with each of the 30-day in-person reviews, the staff conducts a psychiatric or psychological assessment of the inmate, which is submitted to the reviewing authority in a written report 'address[ing] the inmate's adjustment to his surroundings and the threat the inmate poses to self, staff and other inmates.'" 28 CFR § 541.20(c) (1982).

According to the Federal Government's brief, the inmate has a right to make a statement at his in-person review disputing the grounds for continued confinement in administrative detention, and he receives a written copy of the staff's decision and its reasons. Brief for United States as *Amicus Curiae* 29–30.

quately disclose the reasons for respondent's prolonged confinement.[28]   Finally, it is by no means clear that the subsequent review proceedings, including Helms' appearance before the Program Review Committee on January 2, 1979, satisfied the mandates of the Due Process Clause.   I therefore respectfully dissent.

---

[28] The written record of the Program Review Committee's decision, App. 13a–14a, does not specifically discuss the progress of the investigation or the need for continuing administrative segregation; it merely states that restrictive custody should continue "until more information is received regarding his involvement in the December 3rd incident."