Anthony **GREEN**, Plaintiff,

v.

Patrick **BAUVI**, Thomas A. Bushek, Clarence Colwell, William Fenton, Ted Nielsen, Ray Sanford, Amy Schnellbaecher, and Jacqueline Trepanier, Defendants.

No. 88 Civ. 5329 (RPP).

United States District Court, S.D. New York.

Sept. 2, 1992.

**1136**

Milbank, Tweed, Hadley & McCloy, by Joseph S. Genova, Gila Gellman, D. Scott Savage, New York City, for plaintiff.

Robert Abrams, Atty. Gen. of State of NY, by Lisa Raphael, Asst. Atty. Gen., New York City, for defendants.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

This is an action for damages brought pursuant to 42 U.S.C. § 1983 ("§ 1983"). Defendants move jointly pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment. Plaintiff cross-moves for partial summary judgment. For the reasons set forth below, Defendants' motion is granted, and Plaintiff's motion is denied.

### BACKGROUND [1]

The events underlying this dispute are described in detail in this Court's prior opinion, familiarity with which is presumed. *Green v. Bauvi,* 792 F.Supp. 928 (S.D.N.Y.1992).[2]

Plaintiff Anthony Green is an inmate in the custody of the New York State Department of Correctional Services. At all relevant times, Plaintiff was incarcerated at Green Haven Correctional Facility ("Green Haven") in Stormville, New York.[3] The Defendants were at all relevant times employed at Green Haven.

### I. EVENTS OF MARCH 1988

On March 7, 1988, Defendant Jacqueline Trepanier, a Green Haven Corrections Officer, issued a misbehavior report ("MR–1") charging that on March 6, 1988:

Inmate Green was standing in the corridor talking to another inmate. When he finished talking, he stepped inside D-block door and handed me these papers and said, "these are the papers I said I would give you." [4] He rapidly disappeared down the

1. The material facts herein are taken from Plaintiff's and Defendants' statements submitted pursuant to Local Civil Rule 3(g).

2. The Court's May 8, 1992 Opinion addressed Defendants' motion to dismiss Plaintiff's Second Amended Complaint. The Court has previously ruled on motions to dismiss Plaintiff's original Complaint and his Amended Complaint. *See Green v. Scully,* No. 88 Civ. 5329, 1989 WL 74429 1989 U.S.Dist. LEXIS 7141 (S.D.N.Y. June 27, 1989).

3. Plaintiff is presently incarcerated at the Shawangunk Correctional Facility in Walkill, New York.

4. The papers were entitled "Basic Masonic Body Signs." Gellman Aff., ¶ 4.

corridor before I could refuse the papers or say anything at all. This is not the first time I have been approached by this inmate. He past [sic] me, while walking with his company and made gestures with his lips to say, "I love you." I feel inmate Green may be obsessed with me. I did not do anything to warrant this type of behavior from inmate Green.

Affidavit of Gila Gellman, sworn to on July 7, 1992, ("Gellman Aff."), Exh. B. MR–1 charged Plaintiff with violating three prison disciplinary rules 107.10, 107.11, and 109.10.[5] On March 7, 1988,[6] Plaintiff was served with a copy of MR–1 and thereafter placed in keeplock confinement.[7]

On March 9, 1988, Plaintiff was transferred to Housing Block A–2, which at that time was used to house inmates in either extended keeplock or in involuntary protective custody ("IPC").[8]

Prison records for March 12, 1988 refer to Plaintiff as an IPC inmate.

On March 14, 1988, while Plaintiff was awaiting a hearing on the charges in MR–1, Corrections Officer Patrick Bauvi, authorized by Lieutenant William Fenton, issued a rec-

ommendation that Plaintiff be placed in IPC. The IPC recommendation stated:

> From information received it appears that you developed an infatuation for a member of this facility. On one occasion, you had passed C.O. Trepanier in the hallway while you were walking with your company. You made motions with your lips and muttered the words "I LOVE YOU". On March 6, 1988 you approached C.O. Trepanier and gave her some papers. The Administration of this facility strongly believes your apparent infatuation with this Officer could lead to a dangerous situation there for, for the safety of the staff member the administration feels you should be separated from this officer.

Gellman Aff., Exh. G. Plaintiff was served with the IPC recommendation on March 14, 1988, and Green Haven log books reflect that at 10:40 p.m. that day, he was "put on IPC status per order Capt. McMahon." Gellman Aff., Exh. I.

On March 15, 1988, Defendant Clarence Colwell was appointed by Superintendent Charles Scully to conduct a "Superintendent's Proceeding" on Plaintiff. The term

---

5. The current versions of these disciplinary rules, implemented on September 1, 1988, provide:

(1) Rule 107.10—"Inmates shall not physically or verbally obstruct or interfere with an employee at any time."
(2) Rule 107.11—"Inmates shall not verbally or in writing harass employees or any other persons. This includes using insolent, abusive and/or obscene language and gestures."
(3) Rule 109.10—"Inmates shall not be out of place in any area of the facility." *See* 7 NYCRR § 270.2.

6. Plaintiff's complaint alleged that he was placed in keeplock on March 9, 1988. Second Amended Complaint ¶ 2. In connection with this motion, however, Plaintiff has submitted a copy of a portion of Green Haven's Keeplock Logbook which shows that Green was placed in keeplock on March 7, 1988. Gellman Aff., Exh. E. Defendants "dispute that plaintiff was confined on March 7, 1988, since plaintiff alleged in his complaint that he was confined on March 9, 1988." Def. Response to Pl. 3(g) Stmt. ¶ 4. Defendants' assertion, unsupported by any evidence or affidavits, does not meet the standard required by Rule 56(e) of the Federal Rules of Civil Procedure for raising a genuine issue of fact.

7. "Keeplock is a form of administrative segregation in which the inmate is confined to his cell,

deprived of participation in normal prison routine, and denied contact with other inmates." *Gittens v. Le Fevre*, 891 F.2d 38, 39 (2d Cir.1989). *See also* 7 NYCRR § 251–1.6 (regulations governing keeplock confinement).

8. IPC is appropriate for, "An inmate who may be a potential victim or a witness likely to be intimidated, or who lacks the ability to live in the general facility community and who may for good cause be restricted from communication with the general inmate population, and who does not voluntarily accept admission into protective custody status." New York Comp. Codes R. & Regs. tit. 7 ("7 NYCRR") § 330.2(b).

Inmates in IPC are confined to Special Housing Units ("SHUs"). SHUs are "self-contained prisons-within-a-prison, consisting of individual cells, guard control areas, a kitchen, and an outdoor exercise area. * * * Prisoners are usually confined to their cells for approximately 23 hours per day, leaving only one hour of exercise, showers, cell cleaning, medical attention, and visits." *Anderson v. Coughlin*, 757 F.2d 33, 34 (2d Cir.1985). SHUs are also used to house prisoners in voluntary protective custody, prisoners awaiting disciplinary hearings, prisoners serving time in segregation as punishment for disciplinary rule violations, and prisoners under mental observation. *Id.*

"Superintendent's Proceeding" is apparently used to refer to Tier III hearings [9] on charges in misbehavior reports and to IPC hearings.

On March 17, 1988, Plaintiff was summoned for a hearing before Lt. Colwell (hereinafter "the March hearing"). At the outset of the hearing, Plaintiff questioned Lt. Colwell about MR–1. Lt. Colwell responded that it is Green Haven policy that where an inmate is accused of making a show of affection toward a female employee, the matter is handled by issuing an IPC recommendation, not a misbehavior report. The transcript of the hearing indicates that Lt. Colwell stated that MR–1 had been "in essence dismissed," and that the hearing was proceeding on the IPC recommendation. Colwell Aff., Exh. C. at 1–2.

Plaintiff confirmed that he had met with Sgt. Patterson, his employee assistant, and that he was satisfied with the assistance rendered. Lt. Colwell then reviewed with Plaintiff his request for witnesses. Plaintiff identified Trepanier, Officer Kunak, and inmates Pierce and Willingham as his requested witnesses. He also identified Officer Chaire as a "character" witness. Lt. Colwell told Plaintiff that unless Officer Chaire was present at the incident with Trepanier and could contribute information as to what happened, he would not be permitted as a character witness.

During the hearing, Plaintiff stated that he was not guilty of the charges at issue; that he could not understand how Trepanier could pinpoint him out of all the inmates in his company and say he mouthed the words "I love you"; that he was a Christian and did not "lust women"; and that he did not hand Trepanier the "Basic Masonic Body Signs" papers. Plaintiff also stated that he had been placed in IPC at Auburn Correctional Facility in 1987 because he was "attracted" to three female nurses; that he had been seen recently by the Psychiatric Satellite Unit at Green Haven; and that he had "men-

tal problems." The hearing was adjourned until the next day so that the two inmate witnesses could testify.

On March 18, 1988, Inmate Willingham testified that he did not see Plaintiff pass any note to Trepanier; that it was possible such a note had been passed; that he did not hear Plaintiff tell Trepanier that he loved her because he was not paying attention; and that he did not even remember seeing Trepanier. Inmate Pierce testified that he had no knowledge of the incident, but that it was possible a note had been passed. Lt. Colwell advised Plaintiff that the two officers he requested were unavailable to testify on March 21, 1988 and confirmed that Plaintiff himself could not appear on March 21, 1988 because he had two medical appointments scheduled for that day. He advised Plaintiff that an extension would be requested permitting the hearing to extend beyond 14 days from March 7, 1988.

When hearing reconvened on March 22, 1988, Lt. Colwell advised Plaintiff that an extension had been granted which permitted the hearing to continue and conclude on March 22, 1988. Officer Kunak was called to testify, and Plaintiff admitted that he had no questions to ask of him because he was not present during the incident at issue. Plaintiff stated that he called him as a witness because the officer was a "Christian" and knew Plaintiff to be a "Christian." Officer Kunak confirmed that he knew nothing about the incident, and that he had not observed Plaintiff around any female employees.

Lt. Colwell again stated that MR–1 had not been acted upon, and that the instant hearing was an IPC hearing, not a Tier III hearing. Lt. Colwell wrote "Time factor Dismissed Handled as a IPC Hearing" across Plaintiff's copy of MR–1, dated the form, and signed his name.

Plaintiff's last requested witness was Trepanier. She testified that Plaintiff gave her papers although she told him that she did not want them; that on an earlier occasion Plain-

---

9. 7 NYCRR § 270.3 provides for three separate tiers of disciplinary hearings for the purpose of determining allegations of rule violations contained in misbehavior reports:

    (1) Tier I—violation hearing

    (2) Tier II—disciplinary hearing

    (3) Tier III—superintendent's hearing

Of the three tiers, Tier III hearings allow for the most severe punishment but require the most extensive procedural safeguards.

tiff had mouthed "I love you"; and that her conduct with Plaintiff had always been "strictly official business." The hearing was then concluded.

In his written "IPC Hearing Determination" issued on March 22, 1988, Lt. Colwell determined "that you [Plaintiff] are a threat to the staff of this facility, and that you are to remain in IPC until you receive a clearance from the Mental Hyg[iene] unit, that you are not a threat." Plaintiff appealed Lt. Colwell's determination, and on March 31, 1988, Deputy Superintendent C.R. Winch concluded that there was "no evidence" to hold Plaintiff in IPC and ordered that he be released. Gellman Aff., Exh. N. At the time of his release, Plaintiff had not been evaluated by the Mental Hygiene Unit.

## II. EVENTS OF SEPTEMBER 1988

On September 15, 1988, Defendant Ted Nielsen issued a misbehavior report ("MR–2"), charging that on September 15, 1988:

> Green grabbed Physical Therapy Assistant Amy Schnellbaecher's hand and said, "I love long fingernails, I'd love to have you rake these up and down my back." Inmate Green had previously made personal remarks about Ms. Schnellbaecher in her presence. To include, how tight her pants are and how much he loves her fingernails.

Gellman Aff., Exh. O. MR–2 charged Plaintiff with violating prison disciplinary rule 101.10.[10]

On September 16, 1988, Plaintiff received a copy of MR–2 and was placed in keeplock. Plaintiff selected Sgt. Patterson as his employee assistant, and that assistance was completed on September 19, 1988.

The Tier III hearing on the charges in MR–2 (hereinafter "the September hearing") was to commence on September 21, 1988 before Deputy Superintendent Thomas Bushek. When Deputy Bushek met with Plaintiff on that date, however, Plaintiff advised him that his copy of MR–2 was missing some lines. The hearing therefore did not formally commence that day, and no plea was taken.

After meeting with Plaintiff on September 21, 1988, Deputy Bushek spoke to Deputy Winch who agreed that Plaintiff should be re-served with MR–2 and given employee assistance again. A complete copy of MR–2 was served on Plaintiff on September 21, 1988. Deputy Bushek also obtained an extension of time which permitted the hearing to commence on September 23, 1988 and to conclude on September 28, 1988.

The hearing on the charges in MR–2 commenced on September 23, 1988 before Deputy Bushek. Plaintiff pled not guilty to the charge that he violated Rule 101.10 and requested that a total of 19 witnesses be called on his behalf.

Officer Nielsen, the first witness, testified that he had not witnessed the incident, but that Amy Schnellbaecher had related it to him.

Schnellbaecher was the next witness to testify. Deputy Bushek permitted her to testify without Plaintiff being in the room because she stated that she feared for her safety. Schnellbaecher testified that Plaintiff had grabbed her hand but that she did not scream because at first she did not want to make a "big deal" of the situation; that she realized that if she let the incident pass, Plaintiff would continue his behavior and keep trying more and more things, so she reported the incident to a corrections officer; and that in the past she had advised Plaintiff to discontinue "rude" conversations which made her uncomfortable, and not to touch her hands or comment on her nails. Deputy Bushek asked Schnellbaecher certain written questions which Plaintiff had prepared, and she answered them. The taped interview was then played back for Plaintiff.

The hearing reconvened on September 26, 1988. Physical Therapist Rod Denahy testified that he did not witness or hear the incident between Plaintiff and Schnellbaecher. Officers Elliot and Urcioli were also called to testify. Neither officer was a witness to the incident and neither had knowledge of the events that transpired between Plaintiff and Schnellbaecher.

---

**10.** Rule 101.10 provides, "Inmates shall not engage in, encourage, solicit, or attempt to force others to engage in sexual acts." 7 NYCRR § 270.2.

Plaintiff was notified that inmate Mark Stephenson had refused to testify on his behalf. Plaintiff received a form which reflected this information.[11] Plaintiff was also notified that the other correctional staff he requested as witnesses were off duty and unavailable that day. Plaintiff stated that these individuals were just "character" witnesses. Plaintiff was further advised that two requested inmate witnesses who were identified only by the nicknames "Watossi" and "Butter" could not be identified. Plaintiff told Deputy Bushek that they worked in the law library, but these inmates were never found.

On September 28, 1988, the day the hearing was to conclude, a second extension was requested from Albany because Deputy Bushek was on vacation and would be unavailable until September 30, 1988. The extension was granted, permitting the hearing to continue and conclude on September 30, 1988.

On September 30, 1988, inmate Jimmy Lee Allen was called to testify on Plaintiff's behalf. Inmate Allen appeared only as a character witness as he had no knowledge of the incident at issue. Sgt. Ercole also testified as a character witness, and he stated that he had no personal knowledge of the incident at issue.

Deputy Bushek then asked Plaintiff if he had any further testimony or documentary evidence that he wished to present. Plaintiff did not mention any remaining witnesses, but asked that the record reflect that MR–2 was his first actual keeplock confinement since December 1987.

After the hearing was adjourned, Deputy Bushek determined that Plaintiff had violated Rule 101.10, and he imposed a penalty of 90 days keeplock or SHU confinement, and an additional 90 days deferred for 180 days. Plaintiff appealed the determination, and it was upheld by Deputy Winch on October 11, 1988.

---

11. Sgt. Patterson's assistance form also noted that inmate Griffin had refused to testify on

## III. PLAINTIFF'S CLAIMS

In his Second Amended Complaint, Plaintiff alleged violations of his rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment arising from procedural defects in the March and September 1988 hearings and from the conditions of his confinement in keeplock. The Court's prior opinion dismissed eight of Plaintiff's twelve causes of action, leaving only the following procedural due process claims:

(1) against Lt. Colwell for subjecting Plaintiff to the IPC hearing on March 22, 1988 based upon the same charges that Plaintiff alleges were dismissed as time barred on March 17, 1988;

(2) against Lt. Colwell for failing to commence the March 17, 1988 hearing within 7 days of plaintiff's placement in Keeplock confinement and for failure to request an extension of time;

(3) against Lt. Colwell for failing to complete the March hearing within 14 days following the writing of MR–1 and for failing to seek authorization for the delay;

(4) against Defendant Thomas Bushek for failing to commence the September 1988 hearing in a timely manner and for "knowing and intentional procedural errors in the MR–2 hearing; and

(5) against Defendant Ray Sanford for "knowing and intentional procedural errors" in connection with a September 1988 hearing related to charges against Plaintiff in a third misbehavior report ("MR–3").

*Green,* 792 F.Supp. 928, 941.

Defendants now move for summary judgment on all of Plaintiff's claims. Plaintiff cross-moves for partial summary judgment with respect to his claims against Lt. Colwell.

## DISCUSSION

"Summary judgement is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of

Green's behalf.

fact could find in favor of the non-moving party." *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 10 (2d Cir.1989). The substantive law governing the case will identify the facts that are material, and "[o]nly disputes of fact that might affect the outcome of the suit under governing law will properly preclude entry of summary judgment ..." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ The movant for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion" and identifying which materials "demonstrate the absence of a genuine issues of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once this showing has been made, the burden then shifts to the non-movant who "must set forth facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. "Conclusory allegations will not suffice to create genuine issues of material fact. There must be more than a scintilla of evidence and more than some metaphysical doubt as to the material facts." *Delaware & Hudson Ry. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir.1990) (citations omitted), *cert. denied*, ‒‒ U.S. ‒‒, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991).

## I. CLAIM AGAINST LT. COLWELL FOR PROCEEDING WITH THE IPC HEARING

■ Defendants move for summary judgment on Plaintiff's claim that Lt. Colwell violated Plaintiff's due process rights by subjecting him to the March hearing based upon the same charges in MR–1 that were dismissed as time barred on March 17, 1988. Even assuming that Plaintiff could show that Lt. Colwell's decision to proceed with the March hearing was wrongful, Lt. Colwell would still be entitled to summary judgment on the grounds of qualified immunity.

■ Qualified immunity shields state officials who perform discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The Second Circuit has observed that:

> [E]ven if the contours of the plaintiff's federal rights and the officials permissible actions were clearly delineated at the time of the acts complained of, the defendant may still enjoy qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights. Though this ... route to exoneration ... has its principal focus on the particular facts of the case, it too may lead to summary judgment if the defendant "adduce[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ]" to believe that he was acting in a fashion that did not clearly violate an established federally protected right.

*Robison v. Via*, 821 F.2d 913, 920–21 (2d Cir.1987) (citation omitted).

Here, Lt. Colwell is entitled to qualified immunity because no reasonable trier of fact could find that it was objectively unreasonable for him to believe that subjecting Plaintiff to the March hearing violated any of Plaintiff's established federally protected rights. An examination of the evidence adduced by the parties supports this conclusion.

First, Lt. Colwell was designated by Superintendent Scully as the hearing officer for Plaintiff's IPC hearing on March 15, 1988, one day after the IPC recommendation was issued. He was neither involved in the issuance of the IPC recommendation nor involved in any of the events leading to its issuance. Def. 3(g) Stmt. ¶ 7.[12] Prior to his

12. In Plaintiff's "Response To Defendant's Rule 3(g) Statement" ("Pl. Resp."), Plaintiff repeatedly states that he "has insufficient knowledge to dispute or accept the accuracy" of certain state-

ments. *See, e.g.*, Pl. Resp. ¶ 6, 7, 12, 13. In responding to a motion for summary judgment, a party "may not rest upon the mere allegations or denials of [its] pleadings, but [it] must set forth

designation as hearing officer, Lt. Colwell did not even know of the existence of MR–1. *Id.* ¶ 12.

Second, when the issue of MR–1 was raised by Plaintiff at the hearing on March 17, 1991, Lt. Colwell advised Plaintiff that the hearing was proceeding on the IPC recommendation and that MR–1 had "in essence been dismissed." *Id.* ¶ 12; Colwell Aff., Exh. C. at 2. After the conclusion of the proceedings on March 17, 1988, Lt. Colwell confirmed with the disciplinary office that no disciplinary hearing was or had been scheduled on the charges in MR–1 and that no disciplinary hearing officer was ever assigned. *Id.* ¶ 14. Through the course of the March hearing, Lt. Colwell made additional efforts to assure Plaintiff that the charges in MR–1 were nullified or dismissed. *Id.* ¶ 16.

Third, it is not disputed that it has been Green Haven policy since at least July 1986 that when an inmate is accused of making a show of affection to a female employee, the situation is to be handled as one appropriate for IPC.[13] Def. 3(g) Stmt. ¶ 13. Furthermore, there is no prison rule or regulation which prohibits the issuance of an IPC recommendation based on the same conduct charged in a prior misbehavior report. Accordingly, it was objectively reasonable for Lt. Colwell to have believed that the issuance of the IPC was proper prison procedure.

Lastly, the Court notes that Plaintiff has had an opportunity to conduct discovery with regard to his theory that it was a Green Haven practice to confine prisoners on charges in misbehavior reports and later to issue superseding IPC recommendations. Such a practice would allow prison officials to confine prisoners pending hearings for periods of time in excess of that permitted by applicable regulations. Plaintiff, however, has been unable to uncover any evidence

which would show that such a practice existed at Green Haven, let alone that Lt. Colwell was party to such a practice. *See* Transcript of Oral Argument of July 29, 1992 ("Tr.") at 13–14.

Taken together and viewed in the light most favorable to Plaintiff, these facts compel the conclusion that it was objectively reasonable for Lt. Colwell to believe that proceeding with the March hearing did not violate Plaintiff's due process rights. Lt. Colwell proceeded with the hearing at the direction of his superiors, with the apparent support of Green Haven's disciplinary office, and in accordance with existing Green Haven policy. Plaintiff has failed to provide any evidence supporting his assertion that Lt. Colwell proceeded with the hearing with knowledge that the IPC recommendation was issued for the purpose of keeping Plaintiff confined in keeplock or IPC without a hearing. Accordingly, Lt. Colwell is entitled to qualified immunity on this issue, and Defendants' motion for summary judgment is granted.

## II. CLAIM AGAINST LT. COLWELL FOR DELAY IN COMMENCEMENT OF THE MARCH HEARING

■ Defendants move for summary judgment on Plaintiff's claim that Lt. Colwell violated Plaintiff's due process rights by failing to commence the March hearing within the time limit set forth in applicable state regulations. As explained below, although Plaintiff's due process rights might have been violated by his 10–day confinement pending the March hearing, Plaintiff cannot recover damages for this possible violation from Lt. Colwell.

New York law requires that Tier III and IPC hearings must commence within specific

---

specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). *Accord* S.D.N.Y. Civ.R. 3(g). Plaintiff's bare denials fail to meet this burden and do not identify a genuine issue for trial.

**13.** Although the regulations governing IPC do not explicitly permit admission to IPC for such a reason, *see* 7 NYCRR § 330.2(b), there is case law which supports the propriety of confining

inmates in IPC who threaten the safety or security of the staff or facility. *See Blake v. Mann,* 145 A.D.2d 699, 535 N.Y.S.2d 240, 242 (3d Dep't 1988) (placement in IPC of inmate who is a threat to institutional safety and security was not irrational), *aff'd,* 75 N.Y.2d 742, 551 N.Y.S.2d 888, 551 N.E.2d 89 (1989); *Nichols v. Mann,* 156 A.D.2d 774, 549 N.Y.S.2d 827 (3d Dep't 1988) (inmate's "notoriety" and previous high level involvement in drug activity establish good cause for placement in IPC).

time limits. With regard to Tier III hearings, 7 NYCRR § 251–5.1(a) provides:

> Where an inmate is confined pending a ... superintendent's hearing, the hearing must be commenced as soon as is reasonably practicable following the inmate's initial confinement pending said ... superintendent's hearing, but in no event may it be commenced beyond seven days of said confinement without authorization from the commissioner or his designee.

Inmates confined in IPC are entitled to a hearing "conducted within 14 days in accordance with Part 254 of this Title,[14] to determine the need for protective custody admission." *See* 7 NYCRR § 330.3(b).

The Second Circuit has ruled that prison officials' failure to comply with these regulatory time limits may constitute a violation of an inmate's due process rights. *See Russell v. Coughlin*, 910 F.2d 75, 78 (2d Cir.1990) (where inmate was held in keeplock without a hearing for 10 days in violation of § 251–5.1(a), he was denied due process); *Matiyn v. Henderson*, 841 F.2d 31, 36 (2d Cir.) (regulations governing IPC admission create a protected liberty interest, and where prison officials failed to give IPC inmate notice and hearing, he was deprived of due process), *cert. denied*, 487 U.S. 1220, 108 S.Ct. 2876, 101 L.Ed.2d 911 (1988).

Plaintiff maintains that the timeliness of the March hearing must be determined with reference to the regulations governing Tier III hearings. It is not disputed that Plaintiff was held for 10 days prior to the hearing before Lt. Colwell. Because this period exceeded the seven-day time limit under 7 NYCRR § 251–5.1(a), and because Defendants have failed to provide any explanation for the unreasonable delay, Plaintiff argues that he is entitled to summary judgment on this issue. *See Russell*, 910 F.2d at 78; *Cortez v. Selsky*, No. 91 Civ. 1905, 1992 WL 42201, at * 6, 1992 U.S.Dist. LEXIS 2237, at * 17–18 (S.D.N.Y. Feb. 26, 1992) (confinement for even one day beyond regulatory limit raised genuine issue of material fact as to reasonableness of the delay).

Defendants maintain, however, that the time limit for Tier III hearings is irrelevant, because MR–1 was nullified by the subsequent issuance of the IPC recommendation on March 14, 1988. Accordingly, the timeliness of the March hearing should be determined with reference to the 14–day time limit applicable to IPC hearings.

The Court assumes *arguendo* that the applicable regulation is that governing Tier III hearings, and, in the absence of explanation for the delay in commencing the March hearing, Plaintiff's 10–day confinement would constitute a violation of his due process rights. Nevertheless, Lt. Colwell is still entitled to summary judgment, because there is no evidence suggesting that Lt. Colwell played any role in Plaintiff's confinement.

■ Section 1983 imposes liability only on persons who subject, or cause the complainant to be subjected to a deprivation of a right secured by the Constitution or laws of the United States. *Rizzo v. Goode*, 423 U.S. 362, 370–71, 96 S.Ct. 598, 603–04, 46 L.Ed.2d 561 (1976). Accordingly, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Moffitt v. Brookfield*, 950 F.2d 880, 886 (2d Cir.1991). The Second Circuit has consistently refused to allow § 1983 recovery from defendants who were not personally responsible for the claimed constitutional violations. *See, e.g., Al–Jundi v. Estate of Rockefeller*, 885 F.2d 1060, 1065 (2d Cir.1989); *Williams v. Smith*, 781 F.2d 319, 224 (2d Cir.1986); *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir.1985).

As noted above, it is undisputed that Lt. Colwell had no involvement with the charges against Plaintiff until March 15, 1988; that Lt. Colwell was not involved in the issuance of the IPC recommendation or in any of the events leading to its issuance; and that Lt. Colwell did not know of the existence of MR–1 prior to his designation as hearing officer. Def. 3(g) Stmt. ¶¶ 7, 12. Accordingly, there is no evidence which could support a finding that Lt. Colwell was personally responsible for confining Plaintiff for 10 days pending the March hearing. Indeed, Lt. Colwell be-

---

**14.** Part 254 of 7 NYCRR sets forth procedures which govern the conduct of Tier III hearings.

gan the hearing just two days after he was assigned as the hearing officer and three days after the IPC recommendation was issued.

Plaintiff has failed to point to any evidence which would allow a reasonable trier of fact to find that Lt. Colwell was personally responsible for Plaintiff's extended confinement pending the March hearing. Therefore, under § 1983, Lt. Colwell cannot be held liable for any damage to Plaintiff which resulted from the delay in commencement of the March hearing. Accordingly, Lt. Colwell is entitled to summary judgment on this issue.

### III. CLAIM AGAINST LT. COLWELL FOR DELAY IN CONCLUSION OF THE MARCH HEARING

■ Defendants move for summary judgment on Plaintiff's claim that Lt. Colwell violated Plaintiff's due process rights by failing to complete the March hearing in accordance with the New York regulation governing Tier III hearings. That regulation provides:

> The ... hearing must be completed within 14 days following the writing of the misbehavior report unless otherwise authorized by the commissioner or his designee. Where a delay is authorized, the record of the hearing should reflect the reasons for any delay or adjournment, and an inmate should ordinarily be made aware of these reasons unless to do so would jeopardize institutional safety or correctional goals.

7 NYCRR § 251–5.1(b). As noted above, the Second Circuit has held that this regulation creates in inmates a protected liberty interest in remaining free from placement in IPC, and a failure to comply with this time limit may constitute a violation of an inmate's due process rights. *See Russell*, 910 F.2d at 78.

■ The March hearing concluded on March 22, 1988, 15 days after Plaintiff's initial confinement on the charges in MR–1. Plaintiff does not dispute, however, that Lt. Colwell properly obtained an extension which permitted the hearing to conclude one day beyond the fourteenth day of Plaintiff's confinement. At the conclusion of the proceedings on March 18, 1988, Lt. Colwell had advised Plaintiff that he was planning to request an extension because two employee witnesses requested by Plaintiff were unavailable on March 21, and because Plaintiff had two medical appointments scheduled for that day. When the hearing resumed on March 22, 1988, Lt. Colwell notified Plaintiff that an extension had been obtained due to the unavailability of the employee witnesses and Plaintiff's medical appointments. Def. 3(g) Stmt. ¶ 29–30.

In obtaining an extension of time within which to complete the hearing, Lt. Colwell complied with the explicit requirements of 7 NYCRR § 251–5.1(b). Where an extension which permits a reasonable delay in concluding a hearing is properly obtained, no violation of due process results. *See, e.g., Taylor v. Coughlin*, 135 A.D.2d 992, 522 N.Y.S.2d 714, 715 (3d Dep't 1987) (hearing which concluded 20 days after inmate's confinement after three requested extensions of time did not prejudice inmate or deny him due process); *Hodges v. Scully*, 141 A.D.2d 729, 529 N.Y.S.2d 832, 833 (2d Dep't 1988) (hearing which concluded 17 days after inmate's confinement after two requested extensions did not violate inmate's due process rights). Here, it was reasonable for Lt. Colwell to obtain a one day extension to allow Plaintiff to obtain medical attention and to ensure that witnesses requested by the Plaintiff could appear on his behalf.

Accordingly, Plaintiff cannot assert a due process claim based upon an alleged violation of § 251–5.1(b), and Lt. Colwell is entitled to summary judgment on this claim.

### IV. CLAIMS AGAINST DEPUTY BUSHEK

Defendants move for summary judgment on all claims arising from Deputy Bushek's conduct of the September hearing. Plaintiff concedes that the September hearing was commenced and completed in a timely manner, and that Deputy Bushek's denial of certain of Plaintiff's requested witnesses did not constitute a violation of due process. Accordingly, Defendants are entitled to summary judgment on those claims.

■ Plaintiff, however, presses his allegation that his due process rights were violated

by Deputy Bushek's failure to comply with the following requirements set forth in 7 NYCRR § 251–5.1(b):

Where a delay [in completing a Tier III hearing] is authorized, the record of the hearing should reflect the reasons for any delay or adjournment, and an inmate should ordinarily be made aware of these reasons unless to do so would jeopardize institutional safety or correctional goals.

Plaintiff charges that in violation of these requirements, Deputy Bushek failed to include in the hearing record explanations for the extensions obtained on September 21, 1988 and September 28, 1988, and failed to advise Plaintiff of the reasons for obtaining those extensions. Even assuming these allegations to be true, Deputy Bushek is still entitled to summary judgment on the remaining claims against him because the regulation at issue does not create a protected liberty interest.

▆▆▆▆ "While no State may 'deprive any person of life, liberty, or property, without due process of law,' it is well settled that only a limited range of interests fall within this provision." *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983) (quoting U.S. Const. amend. XIV). As the Court in *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989), observed:

The types of interests that constitute "liberty" and "property" for Fourteenth Amendment purposes are not unlimited; the interest must rise to more than "an abstract need or desire," and must be based on more than "a unilateral hope." Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it. Protected liberty interests "may arise from two sources—the Due Process Clause itself and the laws of the States."

*Id.,* 490 U.S. at 460, 109 S.Ct. at 1908 (citations omitted). Plaintiff contends that the provisions of 7 NYCRR § 251–5.1(b) allegedly violated by Deputy Bushek create a liberty interest which is protected by the Due Process Clause.

▆▆▆ The mere adoption by the state of procedural guidelines, without more, is insuf-

ficient to give rise to a protected liberty interest. Only the repeated use of language of an unmistakably mandatory character, requiring that certain procedures "shall," "will," or "must" be employed, in connection with requiring specific substantive predicates, will demand a conclusion that the state has created a protected liberty interest. *Matiyn,* 841 F.2d at 34 (quoting *Hewitt,* 459 U.S. at 471–72, 103 S.Ct. at 871).

For example, in *Gittens,* 891 F.2d at 39, the court found that the 7 NYCRR § 251–1.6(a), which provided that keeplock "shall" be imposed only upon the occurrence of certain substantive predicates, created in inmates a protected liberty interest in remaining free from keeplock. Similarly, in *Matiyn,* 841 F.2d at 36, the court ruled that where the regulations governing the placement of inmates in protective custody used language of an unmistakably mandatory character and specified substantive predicates upon which a protective admission may be based, a protected liberty interest was created.

The regulation at issue here, by contrast, does not use language of an unmistakably mandatory nature. It merely provides that the reasons for any delay "should" be reflected on the hearing record, and an inmate "should" be made aware of the reasons for the delay. Nor does the regulation provide specific substantive predicates which proscribe the conduct of prison officials. Thus, this regulation constitutes the mere adoption of procedural guidelines which, without more, does not create a protected liberty interest. *See Hewitt,* 459 U.S. at 471, 103 S.Ct. at 871.

Accordingly, Deputy Bushek's non-compliance with the provision of 7 NYCRR § 251–5.1(b) at issue here did not infringe any protected liberty interest, and did not constitute a violation of Plaintiff's due process rights.

## V. CLAIMS AGAINST LT. SANFORD

Plaintiff concedes the invalidity of his claims against Lt. Sanford. Pl. Response to Def. 3(g) Stmt. ¶¶ 84–101.

## CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is granted, and Plaintiff's motion for partial summary judgment is denied. This action is dismissed with prejudice.

IT IS SO ORDERED.