**Jerome D. CLARK, Plaintiff,**

v.

**Elizabeth NEAL, Michael Costello, Fran Cockroft, Pamela Faulkner, and Barbara Gordon, Defendants.**

**Civ. A. No. 94–379–LON.**

United States District Court,
D. Delaware.

June 28, 1995.

---

Jerome D. Clark, plaintiff, pro se.

W. Michael Tupman, Deputy Atty. Gen., Dept. of Justice, Wilmington, DE, for defendants.

*OPINION*

LONGOBARDI, Chief Judge.

Plaintiff, a state prisoner who appears *pro se,* filed this civil rights action pursuant to 42 U.S.C. § 1983. [Docket Item ("D.I.") 2]. On December 23, 1994, Defendants moved for summary judgment in lieu of filing an answer. [D.I. 24].

## I. BACKGROUND

In November, 1993, Plaintiff was incarcerated at the Multi–Purpose Criminal Justice Facility ("Gander Hill"). Plaintiff's complaint is purportedly grounded in the Fourteenth Amendment's Due Process clause. Plaintiff contends that his constitutional rights were violated because he was placed in pre-hearing detention and removed from Gander Hill's pre-release program without an adequate notice and hearing.

Defendant Gordon is a Correctional Officer at Gander Hill. [Gordon Affidavit ("Aff."), D.I. 23 ¶ 1]. Gordon alleges that Plaintiff has a long history of harassing her. [*Id.* ¶ 7]. When she came home from work on November 5, 1993, she discovered two threatening messages on her answering machine. The first message said: "Mrs. Gordon, this is Zulu. I'm back." The second message said: "Bitch, this is Zulu, I'm back. You can't hide forever, bitch. I'll get you. You won't be around long, and Butcher [Gordon's husband] won't be at your house forever." [*Id.* ¶ 4]. "Zulu" is apparently Plaintiff's nickname. [*Id.,* Neal Aff., D.I. 17 (Nov. 24, 1993 memorandum from Captain Lee to Neal)]. Gor-

don filed an incident report with the Wilmington Police Department and pressed charges in Municipal Court. [Gordon Aff. ¶ 5].

On November 6, 1993, Gordon informed Defendant Costello of the incident. As Staff Lieutenant, Costello is responsible for prison security. [Gordon Aff., D.I. 20 at ¶ 3]. Costello called the Wilmington Police Department to verify that Gordon had filed a complaint, and then "ordered that inmate Clark should be locked down, that is, placed in pre-hearing detention, because he was a security risk." [*Id.* ¶ 5]. Pursuant to Gander Hill procedure, a written order was signed by Costello, charging Plaintiff with "Disorderly/Threatening Behavior to Staff" and "Abuse of Privileges (Phone)." [*Id.* ("1–E Book" page)].

Pursuant to the pre-hearing detention order, Plaintiff "was transferred from the East Wing at Gander Hill to a more secure cell in the 1–E Pod in the West Wing, which is where inmates who are considered a security risk are housed." [Costello Aff. ¶ 6].

Defendant Neal was the Gander Hill Warden, and was responsible for the overall operations and management of the prison. [Neal Aff. ¶ 1]. Defendant Neal states that it was her practice to review and initial incident reports on a daily basis and indicate on the report any further action she felt was necessary. The incident report in the record in this case does not reveal any such comments by Defendant Neal [Gordon Aff. (Incident Report)].

Written Gander Hill procedures also require that the pre-hearing detention order be reviewed every twenty-four hours. [Costello Aff. ¶ 6 (referring to "1–E Book" page)]. Sargeant Joseph W. Medford, who is not a defendant in this action, reviewed the order on November 7, 8, and 9, 1993. [Medford Aff. ¶ 4]. Lieutenant Gerald W. Fahey, who is also not a defendant in this action, reviewed the order on November 6, 10, 11, 12 and 13. [Fahey Aff. ¶ 4]. Both Medford and Fahey state that on the days in question, they made Plaintiff aware of the administrative charge pending against him, spoke with Plaintiff, and "based on what he told [them],

his attitude, and his prior attitude of conduct, [they] determined that he still remained a security risk, and so indicated by signing the 1–E book." [Medford Aff. ¶ 4, Fahey Aff. ¶ 4].

In response, Plaintiff contends that Fahey and Medford never discussed the charges with him. Plaintiff states that Fahey told him he shouldn't have been locked down, that Costello had been looking for an excuse to lock him down, and that Fahey was just following Costello's directions. Plaintiff further states that Medford never discussed the lockdown and that when Medford came to Plaintiff's cell they simply listened to the radio, smoked cigarettes, and "talk[ed] of women and parties." [D.I. 26 at 2–3].

Fahey states that "[o]n November 13, 1993, after talking with Clark, I decided that he was no longer a security risk, and directed that he be removed from lockdown." [Fahey Aff. ¶ 4]. On November 15, 1993, two days after being removed from pre-hearing detention, Plaintiff wrote letters to both Defendant Neal and Deputy Warden Martino, who is not a defendant in this case, requesting an investigation by the internal affairs office because Plaintiff had been "set-up and falsely accused." [Neal Aff. (November 15, 1993, letter from Plaintiff to Neal and November 15, 1993 letter from Plaintiff to Deputy Warden Martino)]. Plaintiff's letter was received by the Warden's Office on November 16, 1993. On November 19, 1993, Defendant Neal responded to Plaintiff's letter informing him that her schedule did not allow her to handle individual cases and providing him with information regarding how to ascertain the proper prison official to contact. [Neal Aff. (November 19, 1993 letter from Neal to Plaintiff)]. On November 17, 1993, Deputy Warden Martino wrote to Defendant Neal and indicated, *inter alia,* that he was requesting Captain Bradley Lee to conduct an investigation. [Neal Aff. (November 17, 1993 letter from Martino to Neal)].

On November 24, 1993, Captain Lee submitted a memorandum to Defendant Neal which detailed his investigation and concluded that because Defendant Gordon did not save the answering machine tape, the incident came down to "one person's word against another." [Neal Aff. (November 24, 1993, letter from Lee to Neal)]. The charges against Plaintiff were apparently dropped due to insufficient evidence. [Neal Aff. ¶ 7; Gordon Aff. ¶ 5].

In July, 1993, Plaintiff had entered Gander Hill's pre-release program, which is "designed to help inmates who have a relatively short time left on their sentence to prepare for life outside the prison." [Cockroft Aff. ¶ 3]. Inmates are only admitted to the program after a hearing. [*Id.* ¶ 3]. Defendant Cockroft is responsible for supervising the pre-release program. [*Id.* ¶ 1]. Defendant Faulkner was Plaintiff's counselor while he was in the pre-release program. [D.I. 2].

Defendant Cockroft states that she was reluctant to admit Plaintiff to the program because of his history of "disruptive behavior," but "decided to give him the chance." [*Id.* ¶ 4]. Plaintiff was removed from the program following the November 6, 1993 lockdown. [*Id.*]. When Plaintiff later sought to be readmitted to the pre-release program, the pre-release program staff decided not to readmit him because of his previous "marginal participation" in the program, and his "continuing disruptive behavior." [*Id.*]. Neither Cockroft nor Faulkner allege any facts to support these allegations of "marginal participation" or disruptive behavior." In response, Plaintiff alleges that statements made to him by Cockroft and Faulkner indicate that he was not let back into the pre-release program solely because of the Gordon incident. [D.I. 26 at 2].

A few months after these events, Plaintiff was released from Gander Hill and assigned to work release at the Plummer Center. Plaintiff subsequently violated the terms of his probation and was reincarcerated at Gander Hill. [Costello Aff. ¶ 7]. Plaintiff is not currently eligible for the pre-trial release program. [Faulkner Aff. ¶ 4]. In June, 1994, Plaintiff filed this action.

## II. LEGAL STANDARD

 Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact that can

be resolved at trial and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Materiality is determined by the substantive law that governs the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* A dispute is "genuine" only if a reasonable jury could return a verdict for the nonmoving party. *Id.* Following a determination that no genuine dispute of material facts exists, the moving party must demonstrate that it is entitled to judgment as a matter of law.

Any doubts as to the existence of genuine issues of fact will be resolved against the moving party and all inferences to be drawn from the material he submits will be viewed in the light most favorable to the party opposing the motion. *Norfolk Southern Corp. v. Oberly*, 632 F.Supp. 1225, 1231 (D.Del.1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)), *aff'd*, 822 F.2d 388 (3d Cir.1987). If the evidentiary record supports a reasonable inference that the ultimate facts may be drawn in favor of the responding party, then the moving party cannot obtain summary judgment. *In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 258 (3d Cir.1983), *rev'd on other grounds sub nom. Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Under the summary judgment standard established by the Supreme Court in *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552, however, the entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552.

The *Celotex* Court further explained that the moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* According to the *Celotex* Court, Rule 56(e) requires the nonmoving party to go beyond the pleadings. The nonmoving party, by affidavits or by depositions, answers to interrogatories and admissions on file must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553. The nonmoving party cannot simply rest on his allegations without "any significant probative evidence tending to support the complaint." *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)).

### III. DISCUSSION

Defendants limit their Due Process analysis to Plaintiff's pre-hearing detention. [D.I. 16]. As the Court reads Plaintiff's complaint, however, Plaintiff also alleges that his Due Process rights were violated when he was removed from the pre-release program without a hearing and then refused readmittance to the program without a hearing. The Court will address both these alleged constitutional violations in resolving Defendants' motion for summary judgment.

Viewing all facts in the light most favorable to the Plaintiff, the Court must assume at this stage of the proceedings that Fahey and Medford did not evaluate the security risk posed by Plaintiff on a daily basis. Moreover, the Court must assume that Gordon's charges against Plaintiff were the sole basis for denying Plaintiff's readmittance to the pre-release program, despite the fact that these charges were dropped. The Court must assume at this stage of the proceedings that both the pre-hearing detention and the denial of readmittance to the pre-release program were punitive in nature. The crucial

issue, therefore, is whether as a matter of law the fact that these actions were taken without a hearing can constitute a violation of Plaintiff's Due Process rights.

In *Sandin v. Conner*, —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court reexamined the inquiry this Court must undertake in analyzing Due Process claims in the prison setting. In *Sandin,* a prisoner physically and verbally resisted a strip search. The prisoner was charged for "high misconduct" for the physical resistance and "low moderate misconduct" for using abusive or obscene language, and for harassing employees. *Id.* at —— – ——, 115 S.Ct. at 2295–96. After a hearing at which the prisoner was not allowed to call witnesses, the prisoner was sentenced to thirty days disciplinary segregation in the "Special Holding Unit" for the high misconduct charge, and four hours segregation for the low moderate misconduct charges.

The prisoner brought a § 1983 claim alleging, *inter alia,* a deprivation of procedural due process. The district court granted summary judgment in favor of the prison officials. The Court of Appeals for the Ninth Circuit reversed, utilizing a methodology established in *Hewitt v. Helms,* 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). Under the *Hewitt* approach, prison regulations which use mandatory language may give rise to a state-created liberty interest entitling a prisoner to the due process protections set forth in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). *Hewitt,* 459 U.S. at 471–472, 103 S.Ct. at 871–72. The Ninth Circuit found that a certain state prison regulation did in fact create a liberty interest, and that due process afforded the prisoner the right to call witnesses. *Id.* at —— – ——, 115 S.Ct. at 2295–97.

The Supreme Court reversed the Ninth Circuit, and in doing so criticized the *Hewitt* approach:

> By shifting the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation, the [*Hewitt* approach] encouraged prisoners to comb regulations in search of mandatory language on which

to base entitlements to various state-conferred privileges. . . .

> Hewitt has produced at least two undesirable effects. First, it creates disincentives for States to codify prison management procedures in the interest of uniform treatment. . . .

> Second, the Hewitt approach has led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone. In doing so, it has run counter to the view expressed in several of our cases that federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment.

[*Id.* at —— – ——, 115 S.Ct. at 2297–99 (citations omitted) ].

The Supreme Court then called for a return to established due process principles:

> Following Wolff, we recognize that States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Id.* at —— – ——, 115 S.Ct. at 2298–99 (citations omitted).

The Court found that the prisoner's confinement did not constitute the type of atypical, significant deprivation required to create a liberty interest. The Court based this conclusion upon three findings: (1) that disciplinary segregation was virtually identical to conditions endured by prisoners in administrative segregation and protective custody; (2) that even inmates in the general population were "locked down" for significant periods of time each day; and (3) the State's action would not inevitably affect the duration of his sentence. *Id.* at —— – ——, 115 S.Ct. at 2299–2300.

In this case, Plaintiff's eight day pre-hearing detention does not constitute the

type of atypical, significant deprivation required to create a cognizable liberty interest. The length of the Plaintiff's pre-hearing detention was reasonable, and far less than the thirty days confinement found to be below the constitutional threshold in *Sandin.* In fact, Plaintiff was removed from pre-hearing detention *before* the charges were dropped, and before the investigation was even completed. There is no evidence in the record to suggest that Plaintiff's confinement was any more severe than inmates who are administratively segregated or under protective custody. Finally, Plaintiff's pre-hearing detention did not affect his sentence. Plaintiff was released from Gander Hill several months after this incident, and was only returned to Gander Hill because of a violation of the terms of Plaintiff's probation.

■ The Court also finds that the refusal to readmit Plaintiff to the pre-release program also does not rise to the level of a Due Process violation. The uncontradicted record in this case is that admittance to the pre-release program is discretionary. Given this fact, summary judgment would be appropriate even under the *Hewitt* approach, and clearly does not constitute the "atypical and significant hardship" required by *Sandin.*

## IV. CONCLUSION

The Court finds that the Defendants' actions did not invoke the procedural guarantees of the Due Process clause. Having resolved the case as a result of this finding, the Court need not address the arguments raised by Defendants in their motion for summary judgment.

Judgment shall be entered accordingly.