**Willie HORNE, Plaintiff,**

v.

**Thomas A. COUGHLIN, III, et al., Defendants.**

**Civil No. 86–CV–672 RWS.**

United States District Court, N.D. New York.

Dec. 4, 1996.

Prisoners' Legal Services of New York, Poughkeepsie, NY (Deborah Schneer, Kenneth R. Stephens, of counsel), for plaintiff.

Dennis C. Vacco, Attorney General of the State of New York, Albany, NY (Steven H. Schwartz, Associate Attorney, of counsel), for defendants.

## MEMORANDUM–DECISION AND ORDER

RALPH W. SMITH, Jr., United States Magistrate Judge.

By Order dated June 14, 1994, this civil rights action, brought pursuant to 42 U.S.C. § 1983, was referred to the undersigned by the Honorable Neal P. McCurn, Senior Judge, for all further proceedings and the entry of final judgment upon the consent of the parties and in accordance with the provisions of 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73.

At all times relevant herein, plaintiff was an inmate in Eastern Correctional Facility ("Eastern"), a New York State prison, defendant Coughlin was the Commissioner of the New York State Department of Correctional Services ("DOCS"), defendant Selsky was the Director of Special Housing and Inmate Discipline for DOCS, defendant Coombe was the Superintendent of Eastern, defendant Demskie was a Captain at Eastern, and defendant Kracke was a Lieutenant at Eastern.

A bench trial was held in this matter in April of 1995. At the conclusion of the trial, the court reserved decision pending the submission of post-trial briefs by the parties. In June of 1995, the Supreme Court handed down its decision in *Sandin v. Conner*, —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418.[1] The parties thereafter submitted extensive post-trial memoranda of law addressing, *inter alia*, their positions with regard to the applicability of *Sandin* to the instant case. This Memorandum–Decision and Order constitutes the court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

*Findings of Fact*

Plaintiff is functionally illiterate and has an intelligence level that is so low that he can be classified as mentally retarded. On December 13, 1984, plaintiff was issued an inmate misbehavior report charging him with several violations of prison rules. This misbehavior report resulted from an incident in which plaintiff, *inter alia*, asked a volunteer teacher at Eastern for a kiss. Plaintiff was thereafter confined to his cell and assigned an employee assistant in accordance with applicable regulations.

---

1. *Sandin* applies retroactively. *See, e.g., Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir.1996) (per curiam).

A disciplinary hearing regarding the charges against plaintiff was conducted by defendant Kracke on December 19, 1984. Plaintiff's employee assistant was not present at this hearing. At the conclusion of the hearing, plaintiff was found guilty of the charges in the misbehavior report and sentenced to one year in the Eastern Special Housing Unit ("SHU"), and received a recommendation that he lose one year of "good time" credits. Plaintiff appealed his disciplinary conviction to defendant Selsky. On January 25, 1985, defendant Selsky modified plaintiff's sentence to 8 months in SHU and 8 months recommended loss of good time. The basis for this modification was defendant Selsky's belief that plaintiff's conduct, while serious, did not warrant the sentence imposed by defendant Kracke.

In April of 1985, plaintiff brought an action in state court, pursuant to Article 78 of the New York Civil Practice Law and Rules, in which he sought (a) to have the results of the December 19, 1984 disciplinary hearing declared void, (b) to have all references to this hearing expunged from his records, and (c) to be restored to the same status that he enjoyed prior to the hearing. On May 1, 1985, presumably as a result of plaintiff's Article 78 proceeding, defendant Selsky administratively reversed plaintiff's disciplinary conviction "for procedural error." The notice accompanying this reversal stated that a rehearing should be conducted within 14 days of the receipt thereof. Furthermore, a memorandum from defendant Selsky to Robert Hoke, who had replaced defendant Coombe as Superintendent of Eastern, stated that plaintiff's disciplinary conviction had been reversed following a discussion with the Attorney General's Office, and that an employee assistant should be present at the rehearing.

The misbehavior report was thereafter re-served on plaintiff, and plaintiff was assigned a new employee assistant. A rehearing was conducted by defendant Demskie on May 9, 1985. Plaintiff's employee assistant was present at this hearing. However, this individual did very little, if anything, to help plaintiff defend himself against the charges in the misbehavior report. Rather, he merely attempted to explain to plaintiff, who was clearly having great difficulty understanding the proceedings, what the hearing officer was saying. At the conclusion of the rehearing, plaintiff was again found guilty of the charges in the misbehavior report and sentenced to 300 days in SHU with loss of various privileges, and 300 days recommended loss of good time. Plaintiff again appealed his disciplinary conviction to defendant Selsky. On May 28, 1985, defendant Selsky again modified plaintiff's sentence, this time to 6 months in SHU with loss of various privileges, and 6 months recommended loss of good time.

Thus, plaintiff ultimately spent 6 months in SHU as a result of the December 13, 1984 misbehavior report. In a letter dated November 22, 1985, the Attorney General's Office withdrew its opposition to plaintiff's Article 78 proceeding, which was still pending. As a result, the relief sought therein was granted and all references to the December 19, 1984 and May 9, 1985 disciplinary hearings were expunged from plaintiff's prison records. This action followed.

Plaintiff's complaint, as amended, seeks to impose liability on defendants based upon a number of legal theories. However, in reality this case involves one issue only, which plaintiff's counsel succinctly stated in her opening statement: "This case involves the question of an illiterate and retarded prisoner's right to counsel substitute" at prison disciplinary hearings. *See* Trial Transcript, at 9.[2] This due process issue has been the overwhelming, if not sole, focus of this 10–year old case, and will be the sole focus of this decision.[3]

---

**2.** *See also id.* at 11 ("[E]ssentially this case is about the fact that at [the December 19, 1984 disciplinary] hearing Mr. Horne, who needed help, didn't get any, and that the defendants knew that he needed help in presenting his defense, that he was not cable [sic] of understanding the procedures, that he wasn't capable of putting on as full and complete a defense as

someone of normal intelligence might otherwise be able to do.").

**3.** This is not to say that the court has ignored plaintiff's other claims. Rather, after careful consideration the court finds that these claims either (a) have been abandoned, and/or (b) were not proven at trial or by plaintiff's post-trial

*Conclusions of Law*

In *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983), the Supreme Court stated that "[w]hile no State may 'deprive any person of life, liberty, or property, without due process of law,' it is well settled that only a limited range of interests fall within this provision." According to the Court, "[l]iberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States." *Id.* The plaintiff in *Hewitt* claimed that inmates have a liberty interest protected by the Due Process Clause "in being confined to a general population cell, rather than the more austere and restrictive administrative segregation quarters." *Id.* at 466–67, 103 S.Ct. at 869. The Supreme Court disagreed, reasoning as follows:

> We have repeatedly said both that prison officials have broad administrative and discretionary authority over the institutions they manage and that lawfully incarcerated persons retain only a narrow range of protected liberty interests. As to the first point, we have recognized that broad discretionary authority is necessary because the administration of a prison is "at best an extraordinarily difficult undertaking," and have concluded that "to hold ... that *any* substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." As to the second point, our decisions have consistently refused to recognize more than the most basic liberty interests in prisoners. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."

*Id.* at 467, 103 S.Ct. at 869 (quotations omitted).

Thus, " 'the Due Process Clause in and of itself' " does not protect an inmate from being transferred from one prison to another, even where the transfer involves such a "significant modification" in the inmate's conditions of confinement as to constitute a " 'grievous loss.' " *Id.* at 468, 103 S.Ct. at 869–70 (quotations omitted). Rather, " '[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.' " *Id.* (quotation omitted).

Nonetheless, the Court held that States could create constitutionally protected liberty interests by enacting regulations that use "language of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed" before an inmate can be placed in more restrictive quarters. *Id.* at 471, 103 S.Ct. at 871. Thus, *Hewitt* "shift[ed] the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation." *Sandin,* —— U.S. at ——, 115 S.Ct. at 2299. "As this methodology took hold, no longer did inmates need to rely on a showing that they had suffered a ' " 'grievous loss' " ' of liberty retained even after sentenced to terms of imprisonment." *Id.* at ——, 115 S.Ct. at 2298 (quotation omitted). According to the Court:

> *Hewitt* has produced at least two undesirable effects. First, it creates disincentives for States to codify prison management procedures in the interest of uniform treatment.... Second, the *Hewitt* approach has led to the involvement of federal courts in the day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone. In so doing, it has run counter to the view expressed in several of our cases that federal courts ought to afford appropriate

submissions. In addition, plaintiff's post-trial motion to amend his complaint will be denied in the court's discretion on the ground that defendants would be severely and unfairly prejudiced by plaintiff's proposed eleventh-hour amend-

ments. *See Fisher v. Vassar College,* 70 F.3d 1420, 1449 (2d Cir.1995) ("Ordinarily, the assertion of a new claim for liability on the last day of trial will be prejudicial.").

deference and flexibility to state officials trying to manage a volatile environment. *Id.* at ——, 115 S.Ct. at 2299.

As a result, the Court held that "[t]he time has come to return to the due process principles we believe were correctly established and applied in *Wolff*[4] and *Meachum.*[5]" *Sandin,* —— U.S. at ——, 115 S.Ct. at 2300 (footnotes added). Thus, while continuing to recognize that "States may under certain circumstances create liberty interests which are protected by the Due Process Clause," *id.,* the Court held that "these interests will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* In so holding, the Court made clear that the placement of an inmate in disciplinary segregation does not, in and of itself, necessarily constitute an "atypical and significant hardship":

> The punishment of incarcerated prisoners ... does not impose retribution in lieu of a valid conviction, nor does it maintain physical control over free citizens forced by law to subject themselves to state control over the educational mission. It effectuates prison management and prisoner rehabilitative goals. Admittedly, prisoners do not shed all constitutional rights at the prison gate, but " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " Discipline by prison officials in response to a *wide range* of misconduct falls within the expected parameters of the sentence imposed by a court of law.

*Id.* at ——, 115 S.Ct. at 2301 (emphasis added) (citations and quotations omitted).

Thus, the Court found that for Conner, a murderer serving 30 years to life in a Hawaii prison, 30 days of "discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might *conceivably* create a liberty interest."

*Id.* (emphasis added). However, the Court noted that:

(1) The conditions of confinement that Conner faced in "disciplinary segregation, with insignificant exceptions, mirrored those conditions imposed upon inmates in administrative segregation and protective custody." *Id.;*

(2) "[T]he State expunged Conner's disciplinary [conviction] 9 months after Conner served time in segregation," *id.,* and thus "Conner's confinement did not exceed similar, but totally discretionary confinement in either duration or degree of restriction." *Id.;* and

(3) "Conner's situation [did not] present a case where the State's action will inevitably affect the duration of his sentence." *Id.* at ——, 115 S.Ct. at 2302.

In the opinion of this court, the spirit of *Sandin* is clear—that "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment," *id.* at ——, 115 S.Ct. at 2299, and that federal courts should be reluctant to squander scarce judicial resources by becoming involved in the "day-to-day management of prisons." *Id.* However, as the *Sandin* "atypical and significant hardship" methodology has begun to take hold, in this Circuit and elsewhere, many courts have attempted to limit *Sandin* to its particular facts. In so doing, these courts have added an additional layer to due process analysis that more than ever enmeshes them " 'in the minutiae of prison operations.' " *Lewis v. Casey,* —— U.S. ——, ——, 116 S.Ct. 2174, 2185, 135 L.Ed.2d 606 (1996) (quotation omitted). In addition, courts have interpreted the scope and applicability of *Sandin* in irreconcilable ways, which has led to vastly differing outcomes in cases that involve similar fact patterns. Thus, in its relatively brief existence, *Sandin,* like *Hewitt,* appears to have produced at least two undesirable effects.

▮ In any event, in this court's opinion the key to the *Sandin* decision is the Court's statement that "[d]iscipline by prison officials

---

**4.** *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

**5.** *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976).

in response to a *wide range* of misconduct falls within the expected parameters of the sentence imposed by a court of law." —— U.S. at ——, 115 S.Ct. at 2301 (emphasis added). Accordingly, absent Supreme Court or Second Circuit precedent clearly to the contrary, the court will find that, where discipline by prison officials will not inevitably affect the duration of an inmate's sentence, it does not impose an "atypical and significant hardship" on an inmate unless (a) the discipline subjects the inmate to a "grievous loss" of liberty, (b) the discipline is grossly disproportionate to either the offense charged or the inmate's total prison sentence, (c) highly unusual or unique circumstances exist which cause otherwise routine discipline to constitute an "atypical and significant hardship" for a particular inmate,[6] or (d) the discipline otherwise "shocks the conscience."

As noted above, in the instant case plaintiff spent 6 months in SHU as a result of the December 13, 1984 misbehavior report, after which all references to the disciplinary hearings resulting therefrom were expunged from his prison records. In light of this fact, as well as the fact that the conditions in "[d]isciplinary segregation in New York mirror[ ], with insignificant exceptions, the conditions of administrative segregation and protective custody,'" *Jones v. Kelly,* 937 F.Supp. 200, 203 (W.D.N.Y.1996) (quotation omitted), the only significant difference between this case and *Sandin* is the amount of time that plaintiff spent in disciplinary segregation.

After careful consideration, the court holds that plaintiff's confinement in SHU, although certainly less pleasant than confinement in general population, did not satisfy any of the above-referenced criteria, and thus did not constitute an "atypical and significant hardship" for plaintiff, a maximum security inmate serving a lengthy prison sentence for attempted murder. Accordingly, plaintiff's

sole remaining claim in this action (*i.e.,* that as a functionally illiterate and mentally retarded prisoner he was entitled to "counsel substitute" at his disciplinary hearings) is without merit, as plaintiff's disciplinary hearings were, under the facts and circumstances of this case, not subject to the protections of the Due Process Clause.

One final point merits discussion. The Supreme Court has repeatedly stated its preference that " '[t]he strong considerations of comity that require giving a state court system that has convicted a defendant the first opportunity to correct its own errors . . . also require giving the States the first opportunity to correct errors made in the internal administration of their prisons.' " *Lewis,* —— U.S. at ——, 116 S.Ct. at 2185 (quotation omitted). In the instant case, plaintiff was able, in spite of his disabilities, to utilize available state procedures to obtain reductions in the sentences imposed as a result of his disciplinary hearings, procure reversals of these hearings, and ultimately get all references to the hearings expunged from his prison records. Moreover, he was able to obtain these results despite the fact that he admitted at trial that he was factually guilty of the conduct underlying the charges in the misbehavior report. Thus, the instant case represents an example of a state system working, at a minimum, competently.[7]

*Conclusion*

For the reasons stated above, it is hereby

**ORDERED,** that the complaint is dismissed and judgment is entered for defendants.

---

6. *See, e.g., Delaney v. Selsky,* 899 F.Supp. 923 (N.D.N.Y.1995) (issue of fact existed with regard to whether the extension of an inmate's confinement in SHU by 197 days created an "atypical and significant hardship" for the inmate due to his unusual height—almost seven feet—combined with conditions of confinement that allegedly caused him "back problems").

7. Although it undoubtedly would have been far more difficult, if not impossible, for plaintiff to obtain the above-referenced results had Prisoners' Legal Services ("PLS") not intervened on his behalf, this court considers PLS, which receives (and probably could not survive without) state funding, to be a part, indeed a critical part, of the overall "state system."